Exhibit 1

# Chapter 5



## My Heartbreak

Wouldn't it be wonderful if the men we dated told us "up front" exactly what they wanted in a relationship? I mean, there are a lot of men out there that want our bodies "up front" in one way or another during our dating moments before marriage. Yet, we wait six months or more before we learn what their original "up front"

27

**Exhibit 1**
**1 of 93**

71

goals and motives are in building relationships with us. We always say "if we only knew back then what we know now, we wouldn't have entered into a relationship with that person." That's how it was with Darron and I. Today, I can easily look back and see what the problems were in our past relationship. But back then, I simply had no clue as to what I was getting into. Darron had a lot of issues. But, I also had my own as well. Taking care of four teens, working night shift, going to college full time, and building a new relationship was way too much for one person to accomplish all at once. I worked so hard during the week and cared for others but couldn't even keep my own house clean. My weekends were also busy because that was when Darron would travel 3 hours to visit me. I hadn't seen a man take that type of initiative to spend time with me like that in years. I truly believed he was sincere. But that was early on in our relationship. Now that I have a full picture of my experience, I clearly see the warning signs that I ignored. I already mentioned that we met online. I also mentioned that he lived in another city. But there

28

**Exhibit 1**
**2 of 93**

72

were more challenges that added to our relationship that would prove to be difficult for us down the road.

Our first date was a dinner date and was a lot of fun. He was very kind, attentive, and we had a lot to talk about. On our second date that same weekend, Darron took a picture of us together to show his students. He asked me to wear this little mascot bracelet for his school and he gave me one of his ID faculty photos as well. He told me I could use it as a key chain to remember him by while we were apart. I thought it was a little soon for all of that. But I didn't think it would cause any harm initially. It did make me feel like he was serious about getting to know me so I was intrigued by the small gesture. Later on into our relationship, I found that these early pictures and this rushing into things was his m.o. to his relationships. For some reason, he was in a hurry to prove to his students and his family that he had someone special in his life but at the time, I didn't know why.

My next warning sign came when he sent me some photos of he and his students during one of their prom nights. One picture was

29

**Exhibit 1
3 of 93**

73

of he and his female students. And the other picture was of him and the boys he taught. My first impression was "Wow. This teacher really has a good relationship with his students". But what I didn't understand was why he was the only faculty in the photos with them. One of his female students had a slit in her dress that was so high that it almost displayed her underwear. And she was standing right next to Darron halfway facing him in the photo. I thought that was a little creepy on the part of the person taking the photos. In the other picture, the boys were all standing dressed up in a huddle and Darron was laying down on the ground in front of them on his side. Darron also wore a tux which made it look as if he himself were going to the prom. His dressing up for the prom was also very unusual. I know this was a small school District. But, when I was back in school, I don't remember ever hanging out with my teachers like that. The smaller school size was really no excuse for what I saw in those pics. There was also one other concern that made me feel a bit qweezy.  Darron was the one and only sports coach for a particular sport at the school. He taught

30

**Exhibit 1**
**4 of 93**

74

the students and was very good at coaching. The school gave him all rights to travel with the students to different cities for competition. Some of those events were overnight events. And once again, he was the only teacher present. There was no dual accountability. That reality was not particularly his fault. But, it did leave the doors open for questions if any unusual incidences arose. In this one particular photo that had me concerned, one of the boys sat quietly by himself as Darron turned to look at him. The picture looked as if the boy was uncomfortable with something pertaining to Darron. I asked Darron where his fellow faculty members were in these pics. But he just said that they let him take the reigns in these areas with the students. That glimpse of qweeziness started to remain throughout our relationship. Especially, as it pertained to his spending so much time alone with his students. When it wouldn't go away, I decided to take it to the Lord in prayer. I needed revelation as to what the Lord was trying to show me, if anything at all.

One month into our relationship, Darron invited me and my

31

Exhibit 1
5 of 93

75

teens to spend Thanksgiving with he and his family. My teens

didn't want to go and really didn't seem to want me around. They

wanted me to cook and get everything nice and wonderful for the

holiday. But, because they knew I had spent so many years alone,

they encouraged me to go ahead and get to know this new man in

my life. They were curious about where things would lead down

the road between Darron and I and they wanted me to be happy. I

was hesitant, but went ahead and spent the holiday with his family.

On the way to Darron's parents house, a crazy deer came crashing

into the car causing Darron and I to do a full 360 spin on the

small highway. I was so terrified, that my stomach just tied up in

knots. Darron's truck was banged up on the front side. Yet, during

the spin, he was completely calm. He controlled this car so well

during that moment that he prevented the two of us from flipping

over the side to our deaths. I knew I had some questions about

this man. After all, we had only been dating a month. But I could

see that he wanted to be a good quality man before me. His

sincerity in trying, caused me to loosen up my reigns and release

**Exhibit 1**
**6 of 93**

76

a little bit of trust in him early on.

At dinner, I met his mom, his dad, his sister, his niece, and their precious little dog. By all appearances, they were a sweet family. His sister was an overachieving RN that lived out of State, and his niece was very intelligent. His father was very kind. And his mother was blessed with the Midas touch when it came to cooking. That woman could cook anything and make it taste amazing.

Pretty soon, all of our weekend moments were spent together. We didn't have a neutral place so we ended up spending almost every weekend at his parents home. They were very nice but we had to include his mom in most of our free time together. After all, it was their house.

**"What I Know Now" Quick Advice Lesson:** When you are entering into a new relationship, you should never agree to meet the other persons parents until you are ready. It is only fair that you have time to get to know the man you are dating first. Then as you build up strength in your relationship, you will be able to

33

**Exhibit 1
7 of 93**

77

withstand judgment on your character. Let's face it, that's what families do when they first meet you...they judge your character. In my case, my ex knew that his mother would be judging me and he valued her opinion greatly. But when you don't know anything about his parents, or how their family dynamic works, you will be at a disadvantage. If a man is getting to know you, and his mother is the matriarch of the family and is judging you by first appearances, you'll never win. First appearances don't give enough time to get a full picture of who you are. And, if his mother criticizes who you are early on, he will be looking for pieces of the same picture she paints of you all throughout the lifespan of your relationship. You will unknowingly be walking on eggshells instead of enjoying getting to know the man you adore. I'll never forget the time I had to drive Darron's parents car from Spokane to Newport Washington. Darron was driving his brand new car from the dealership and needed me to drive his parents car behind him. As we drove and it began to snow, I had difficulty seeing the road. I was pre-diabetic and didn't do well

*34*

**Exhibit 1
8 of 93**

78

with night vision. Darron knew this but was excited about speeding in his new car. He drove so fast that I almost got lost trying to keep up with him. While I was concerned about getting into a car accident with his parents car, Darron was telling his mom to watch me because it was his first time seeing me upset. It was like being in a relationship with both he and his mom and I didn't like it. They didn't get my concerns about avoiding a car wreck and were more concerned about observing my response. At dinner, the two scanned me as if they were waiting for me to explode into little pieces which wasn't going to happen. I admit that I was a little upset. But that was for Darron to work out with me. After all, I was in a relationship with him and we were still learning about each other. But when he invited his mom into a small issue involving the two of us, I slowly began to realize that I was a third party in their unbreakable two party relationship.

Darron's mother had a certain quarky whit about her. She had a nice side, a sarcastic side, and a cruel side to her all in one. Some of the things she said were hilarious. But some of her other

35

**Exhibit 1**
**9 of 93**

79

comments were cold and left me questioning whether she was actually joking about certain things or not. We were just shooting the breeze one day when his mother shared a story about the death of someone she use to work with. She didn't like this co-worker of hers and was glad she was gone. While we were all sitting at the table talking, she shared of how she went to the funeral and stomped on her  previous co-worker's grave just to make sure she was dead. I couldn't explain it. But, there was just something really really cold about her comments. During that same conversation,  she began sharing how life was for her growing up. Her relatives seemed very impressive. She then mentioned that one of her male relatives suffered from depression and that it ran in their family. As the story goes, this relative was in love and happily engaged to a single parent. But when his family got wind of his engagement, they made him break things off with the woman. Back then, this woman's status as a single parent wasn't acceptable to their family. This relative apparently listened to his families wishes and ended up a hermit living depressed and alone

36

**Exhibit 1**
**10 of 93**

80

until he died. It was a very sad story that made me wonder whether or not his mother was trying to tell me something early on since I was also a single parent. In another story, Darron's mom then spoke of how another relative was a professor/narcissist who started out with a wife and a girlfriend. But, somewhere down the line, he had a nervous breakdown because his conscious caught up with him. He just couldn't manage both relationships. I remember appreciating her sharing these stories about her relatives. But I never associated it with relevance between Darron and myself. At times, it seemed as if she was trying to steer Darron's life in a very controlling way by playing with his psyche. She did this by paralleling his life's outcome to that of the relatives mentioned in her stories. When she told Darron that he was a reincarnation of one of her female relatives, I really got unnerved with her. No adult son needs to be told that he was  a woman secretly trapped in a mans body. It was annoying. And to make matters worse, Darren never stood up for himself to refute his mothers sometimes off the wall comments.

37

**Exhibit 1**
**11 of 93**

81

He would just sit quietly until another conversation began. I definitely didn't like what I was seeing. But, it was still early in our relationship. I didn't want to do any wave making until I was sure I had a place in his life to do so.

By December of that same year, Darron had asked me to spend a romantic holiday weekend with him in a beautiful tiny city called Leavenworth. I had never been there before. But, they had beautiful shops and a tree lighting ceremony that I was excited to see. Darron made sure all of that happened. And we had a wonderful time. But, my body was involved and we were sleeping together every chance we could get after that. I was living in sin. And soon, my soul became intertwined with his. I remember waking up one morning, and he was calling me his girlfriend. It was way too soon. But, I accepted the new title anyways. I knew I liked him very much. I also knew that we needed more time to get to know each other. I just didn't want to live outside of God's will with him. He eventually picked up on that because I found him having a ring designed with both of our birthstones on it just

*38*

**Exhibit 1
12 of 93**

82

for me. It was the sweetest thing any man had ever done. And I just fell in love with that man after that. Looking back now, I can see that we were both going through the motions way too soon. We were still getting to know each other, and we were not ready for marriage. Everything we did was temporary and we were really not heading for anything long lasting. Now, the Bible says that *"we should guard our hearts with all diligence".* But I had completely let my guard down. Being tired was no excuse. Relationships are very much like driving a car. You have to stay alert. I bypassed more warning signs that I should have paid more attention to. First of all, there were moments where I saw glimpses of different personalities within this precious man. I saw this teacher/historian/adult man that was absolutely intelligent and wonderful. There wasn't anything he didn't know about history and his knowledge and conversations were always intriguing. I absolutely loved that and began to call him "my sweet man". We also had music and composing in common and loved to write and produce songs. I had always prayed for a man like that. And here

*39*

**Exhibit 1**
**13 of 93**

83

he was right in front of me. But there were other times when I saw this immature boy that seemed to be around sixteen or seventeen years old. This side of his personality was very sarcastic, rude at times, and would cause him to say things that were completely juvenile. I recall the time when I was washing my hands before dinner and had accidentally left my favorite ring on his bathroom counter. We were five months into our dating relationship and he had already proposed and had given me two rings. Since the ring that I left in his bathroom was my favorite, I never even thought twice about the idea that I could retrieve it from Darron on another day. Shortly after I got home from being at his place, he called me very upset. It was this strange tone that I noticed that was so different than any other time. "You purposely left that ring at my house because you wanted to make sure other people knew you were at there" he stated sharply. I didn't even realize that I left my ring. But his tone and attitude brought me to tears because it wasn't true. I was comfortable with him and had no ulterior motives behind anything pertaining to us at that point.

40

**Exhibit 1
14 of 93**

84

After all, we were engaged so why would anything left at his place cause such a stir? When he saw that he upset me, he apologized and assured me that he would never do anything to hurt me etc.... It was as if he came out of his immature self at that moment and became this adult once again. I accepted his apology but it seemed like he was sabotaging our relationship for some reason. I couldn't quite put my finger on it, but I knew something was definitely not right in our situation.

Some other incidences that arose had to do with Darrons lack of boundaries with his students. In one instance, I ended up being confronted by one of his female students at a basketball game he was scoring. Darron's high school classroom had all of these photos of his former students. So, when he added my photo for his students to see, it naturally caused them to ask questions about who I was. My thoughts were more in line of (how about we not put my pic up on the wall until you and I know where we are going in this relationship). But he thought question and answer time about the two of us was fun.  He definitely wanted to

41

Exhibit 1
15 of 93

85

incorporate his personal choices with his students approval. When he began to tell me that his students wanted to meet me and had questions, I was a little stand offish. I wanted to meet his students. I just didn't know if it was alright with their parents. I was a third party and had teens myself. I just felt like there needed to be some sort of boundary clearance with his employer before I started chatting personally about myself with his students.  And what if we didn't last? What would his explanation be? Should every new woman in Darron's life be on display for his students? Or should his personal life be kept separate from them for the time being? Darron felt like everything was fine. And because of this nonchalance, one of his male and female students sat next to me in the bleachers and started questioning me. The boy didn't say anything. He just starred at me as if he and the girl were protecting their teacher. But the girl next to him came up and started asking me to tell her a little bit about myself. I shared my name and said where I was from. But, I was the adult and she was a young girl. I didn't feel that I needed to elaborate. When she

**Exhibit 1**
**16 of 93**

86

continued to ask questions, I got really uncomfortable. I had hoped Darron would step in and say "uh, that's enough". But, he acted like he was one of the student gang instead of acting like a teacher with boundaries. I finally had to say that I didn't feel comfortable giving out anymore information. After that, the girl and the boy left. Call it discernment, but I knew that contact with these two students was not over. At 9:30 pm, at his home, his cell phone rang and Darron claimed that the call was from his female student that approached me earlier at the game. But, it also could have been another woman or former adult female or male student of his. Bottom line is that I truly never knew. Darron told me that the parents had signed a contract with him allowing the students to call him after hours on his cell if it was school related. I was really uncomfortable with that at this point because if it was the girl I met at the game, she had no business calling. She was fifteen to his 50 and the conversation had nothing to do with school. I couldn't tell him what to do. But I felt like the school should have created some type of traceable communication so

43

**Exhibit 1**
**17 of 93**

87

that neither he nor his students would cross boundary lines in their teacher to student communication. It didn't seem healthy and I let him know how I felt. He shared that he would report her calling to the school. And that was the end of it, so I thought. Pretty soon, every time I was with him his cell phone was lit up! He told me that the calls were from his former students who were calling to congratulate him on our engagement. But when the calls got to be so frequent, I began wondering what was really going on. It was as if he were the big man on campus and he was Mr. popular all over again. While he was enjoying the attention, I was mostly thinking about the fact that those were his former students and not his 1980's former classmates or adult basketball buddies from his high school years. I was curious to know whether or not he was noticing the difference. There was one point where he got a call from a former male student. When I asked him who was calling, he told me that the guy was gay and wanted him to come to his dorm to meet with him about something. I remember asking why the guy was reaching

**Exhibit 1**
**18 of 93**

88

backwards for the support of his former high school teacher instead of reaching forward towards college counselors or advisers to meet his emotional needs in his process. But he shared that he liked being there for his students. After this, things just escalated for the worse. While I was in the middle of planning a wedding, he had already sabotaged our relationship by just refusing to set boundaries. The issue wasn't just about his students calling him all hours of the night. It was also about the fact that he gave these students his number and access to reach him at any time. One night while we were watching tv, he read a text aloud that stated "why do we do this to each other?" He claimed that it was a movie trivia game he played with his students. But that's when his stories stopped adding up. If he were truly texting back and forth with his students so late at night, then movie trivia was verification that the communication with them went way beyond school related issues. If he was texting another woman on the side right in front of me, he was being disrespectful to our engagement and his using his students as a cover up was a really risky

45

**Exhibit 1
19 of 93**

89

decision. By outer appearances, his open door 24/7

communication seems like a nice gesture from a nice teacher. But

without some sort of checks and balances, his situation could

have been dangerous. He was a lonely single man whose students

both male and female had access to him. One phone call could

one day become a booty call while no one was ever looking.

When I brought this to his attention, he seemed uncomfortable.

Even his mom started acting differently and stated "Women are

like golf balls. They can always be replaced." When I asked him

what she meant by that, he blew it off claiming she was being

sarcastic about nothing. But since she made statements like these

in my presence, it was clear that she wanted me to hear them. I

started to sense that (he and his mother) were pushing me out of

"our" relationship already. Three months into our relationship,

Darron had shared that there was some abuse issues at the hands

of his father towards the family when he was younger. I saw his

baby pictures and noted that he was such a precious little boy. I

could see that there was some sadness in his face in the photos

46

**Exhibit 1
20 of 93**

90

which explained the circumstances he grew up in. There was one picture where he was sitting by himself in this field on this rock. He couldn't have been more than three or four years old. Yet he looked so sad and overwhelmed. He was simply the cutest little thing. But then, there was also the abuse that made up who he was now as an adult. And he was clearly not dealing with things. Our whirlwind of love began to unravel like a puzzle. And when I tried to put the pieces together, nothing fit. Darron wasn't making good choices and I could clearly see that. I loved him very much and wanted to help him as much as I could. But he had kept so much hidden for so many years that he was used to keeping it inside. Sharing things with me was a start to his healing. But it was also a threat to his mom. And she did not like being exposed. She had a tight grip on him and she was going to keep it that way. At one point, she just approached me and looked me right in the face saying "Do you want my clothes, my scarf, or my house? What do you want from me?" she asked in frustration. I really tried to stay calm when this occurred. But I didn't know what was

47

**Exhibit 1
21 of 93**

91

wrong in that moment. I never asked for anything and couldn't understand what her issue was. What I do know is that it was never a good idea for me to spend time with Darron's family like that. She didn't know me and I didn't know her. Because she was feeling this way, Darron and I really needed to slow down. But instead, we just kept going in the midst of obvious turmoil that kept brewing. The fact that I was such a "yes" person to everything Darron had suggested was the part in our relationship that was completely my fault. It wasn't idol worship. But it became a kind of disregard for what God wanted at the time. We were heading for marriage by July of that year and I didn't want to let go of my dream of spending the rest of my life with Darron. The Lord was trying to warn me, but I didn't want to hear it. Leaving God out, would eventually lead to unnecessary pain that I brought upon myself.

### Adult Children and Abuse

Time with Darron became difficult because now, both he and I were spending every weekend with the very parents that had

*48*

**Exhibit 1**
**22 of 93**

92

abused him. He needed to deal with his childhood issues that were affecting him as an adult. Jumping into marriage wasn't going to make everything alright. He needed Christ front and center in his life. He also needed counseling and time to process all that he had experienced. He needed to learn how to set boundaries that he could stick with on a consistent basis pertaining to his mom, his students, and everything around him. He was a very good man. But, like me, he had way too much on his plate.

His situation was very similar to that of one of my neighbors. She was a young girl that had befriended my daughter. She was always telling my daughter these horror stories about her father and how he was constantly raping her while her mother sat back and watched. It was truly a sick situation. I reported the comments to the local police and to the school counselor. I then suggested that the girl get some help in her situation. But when help arrived, the girl protected her abusive father and denied everything that she had been sharing. The girl stayed in the home as if nothing was wrong. Yet, she kept telling my daughter

49

**Exhibit 1
23 of 93**

93

ongoing stories that verified the opposite. My daughter finally told her that she couldn't carry the weight of the stories being shared but would be praying for her. This young girl had gotten use to identifying with the ongoing rape she experienced at the hands of her own father. She was so use to it that she protected and defended it even when she had a way out. The same went for Darron. He wanted that sense of family and did everything he could to keep it. He wanted me but he also wanted to please his mother. He was always constantly reverting back to childhood memories that were never resolved.

I heard a famous hip-hop artist share her own experience with abuse. She apparently reached out to teens to encourage them to report abuse. When her mother found out, she disappointingly said "I thought this was going to be our little secret". It has taken me a couple of years to understand this. But, I came to realize that there are families out there that want to keep these little secrets hidden and encased in a shell. But, that idea continues to enslave the now adult children who need to be set free from the

50

Exhibit 1
24 of 93

94

sometimes horrific abuse. They need an outlet to talk about it and to recognize that it was wrong. They also need to know that the abuse wasn't their fault, and that it is no longer their responsibility to carry that stone of remembrance inside them. Darron needed to have some sort of positive relationship with his mom if not his father. But what he didn't realize was that his mom's decisions and opinions were no healthier than they were when he was a child suffering in the middle of abuse that she ignored. Even as an adult, his mother backed up his boundary less life even if it was detrimental to his career and reputation. In essence, she was still justifying the very things that hurt Darron. Only, he couldn't see it. I saw Darron making some really great strides towards a more healthy pathway and sensed that he wanted to go forward. But his relationship with his mom kept pulling him back into old ways. As he had right or wrong choices before him, he kept choosing wrong which allowed trouble to continue brewing in both of our lives. The Bible says,

**"See, I am setting before you today a blessing and a curse-the**

**Exhibit 1
25 of 93**

95

*blessing if you obey the commands of the Lord your God that I am giving you today; the curse if you disobey the commands of the Lord your God and turn from the way that I command you today by following other gods, which you have not known."*

*Deuteronomy 11:26-28*

The message here may have appeared to mainly be about what Darron was doing wrong. But, I was in covenant with him by way of our engagement. I was following behind him at the time and was not following nor listening to Jesus. This position that I had put myself in left me uncovered and away from that umbrella of protection that the Lord had offered me as His child. Therefore, whatever was happening with Darron, was happening to me. I was also in line for whatever was coming next whether it be good or bad because of that covenant engagement.

### The Turmoil Continued

Another issue that we had in the process of planning our wedding was Darron's choice for best man. He said he didn't have any adult friends and the only best friend he had was one of his

52

**Exhibit 1
26 of 93**

96

former male students. When he wanted this former student to be his best man, I had to put my foot down. He met this now adult former student when he was only 14 years old. Apparently, he taught his older sister before she passed away. According to Darron, she was rushing away from the school for some reason and got into a fatal car accident. When her little brother got into high school,  Darron took him under his wings and built a personal friendship with  him. Darron said the boy joined the military after graduation. But whenever he returned to his hometown, instead of renting or getting a hotel, Darron claimed his former student stayed with him. Darron shared that when this former student graduated from the military in Hawaii, Darron, against military policy,  stayed in his barracks with him instead of staying in a nearby hotel. When I could see that their friendship had nothing but blurred lines all around, I expressed how I felt about it. Darron tried to tell me that their friendship just happened. But, I had to remind him that this was another teacher to student boundary issue. Their friendship began when the boy was only

53

Exhibit 1
27 of 93

97

fourteen which was not ok. A fourteen year old boy doesn't know how to build a friendship with a 50 year old man. But a 50 year old man knows how to orchestrate one with a fourteen year old boy. It becomes manipulation because of the age and knowledge imbalance. When Darron's mom stepped in to give her opinion, she stressed that the boy was 18 when he stayed with Darron as if it was somehow acceptable. I then made it clear to both Darron and his mother that building personal friendships with minors he was teaching is called "grooming". It's not healthy and it crosses boundaries to what teachers are suppose to be involved in with their students. I never signed on to be anyone's moral compass during our relationship. I was just trying to get the two to rub their eyes a little so that they could see in the midst of their own blindness. Unfortunately, Darron thought my comments were mean. He then refused to hear me out. And before I knew it, the issue worsened. The male student that met me at the basketball game prior, crossed the boundaries Darron refused to set, and got on my facebook wall. I blocked him once. But he somehow found

54

**Exhibit 1**
**28 of 93**

98

a way to enter in on my wall again through the school secretary who had just joined my facebook friends list. She knew about the blurred lines with the students. Yet, she just looked the other way. The whole school dynamic was messed up because no one seemed to be listening. Eventually, this male student started making comments about how he didn't like Darron's friendship building with he and his fellow minor students at the school. And, he made that clear on my facebook wall before my family and friends. I didn't like having to confront this student on my own. But Darron refused to do anything about it. This personal friendship building had been taking place undetected for about five years between Darron and his students. His students had gotten use to boundary crossing with Darron to the point of their creating this tight fraternity/sorority type group that Darron was head of. After graduation, they became adults that could make their own decisions. Because of that, no one ever questioned any boundary issues and Darron could do what he pleased with his now adult students. But this particular boy didn't want to be a part

55

**Exhibit 1**
**29 of 93**

Case 5:17-cv-01153-JGB-KK   Document 1   Filed 06/13/17   Page 56 of 124   Page ID #:56

99

of that groomed society. I'm not even sure that Darron even realized the enormity of the situation he had created. I felt sorry for the young man because choosing to be outside of a group that his teacher was head of, would make him an outcast. It's hard enough being a high school student dealing with small town values, poverty, peer pressure, grades, and so on. But then having this teacher/student group stand against you creates a whole new ball of wax that no student really wants to have to endure. I told this student that if he felt uncomfortable about anything, he needed to report it to the school authorities. I then blocked him from my page and confronted Darron myself. Instead of Darron reaching out for me, he went into defense mode and built up a shell against me. He started being sarcastic, telling me I should go on Oprah, and continued making hurtful comments to me. "Oprah? No he didn't!" I remember thinking.  He didn't just put up a wall against me. He also created a racial barrier between the two of us. This ugly, evil, cancerous spirit of racial hatred that had never been an issue between us before, divided us like an enemy in

56

**Exhibit 1**
**30 of 93**

100

battle. It surrounded our relationship like a blanket and I couldn't shake it off. As I prayed, I could feel the accusations being spoken into Darron's ears against me. " I was black, I couldn't be trusted, I was angry, I was evil, I was a self righteous judgmental Christian, and I wanted to take from Darron by ruining his teaching career". None of those accusations from the enemy were true. Yet, I couldn't stop the train from derailing our relationship. Within days, Darron detached himself from me and started a new relationship with someone else. He stopped talking to me and whenever he did talk, he commented about about how he was traveling here and there with someone else but wasn't telling me who it was. When I wanted to discuss the issues at hand, he just kept dodging me. He simply said goodbye and it was just that easy for him. He was the one that created this problem. Yet, somehow, he found a way to blame me as a result.

We had all of these layers and barriers between us and he pushed me aside instead of trying to work things out. When I sought advice on what to do, a friend told me that I could not

57

**Exhibit 1**
**31 of 93**

101

hesitate on this issue. They suggested that I anonymously call the State and report that the school itself needed some type of monitoring for the safety of both the students and it's faculty. Unfortunately, when I tried to do this, I got a rude awakening. I found that there is no such thing as "anonymous reporting". Once I started the ball rolling, it was all on me. I really loved Darron more than I had ever loved any man. But, I didn't want to be the one to allow this boys voice to be shut out because of that love. I didn't want to be the parent that ignored obvious boundary issues between an adult and a student that could one day lead to manipulation or abuse. So, I was forced to give my name, and share my concerns. I was hoping that the situation would lead to safety and change. But, while on the line, I heard a series of phone clicks. And eventually, the call was transferred from Olympia to ESD supervisors. Then the call went from the ESD offices to Darron's supervisor at the high school he taught at. It was horrible. They never told me who I was being transferred to. And before I knew it, that's who I ended up talking to. I had

58

**Exhibit 1**
**32 of 93**

Case 5:17-cv-01153-JGB-KK   Document 1   Filed 06/13/17   Page 59 of 124   Page ID #:59

102

hoped that the Principal would assure me that he would start working to create systems to set safe boundaries for the good of everyone. Unfortunately, his only concern was whether or not I was planning to sue the District. The lack of concern for the students verified the atmosphere and the work culture that had been created. It wasn't my job to be the lone ranger to tell the Principal that. He must have already known. It should have actually come from the educational advocates at our State Capitol. But when they didn't want to deal with it, they pushed me into the limelight on the issue. When Darron heard about it, he was furious. He told me that everything was fine until I came into the picture. He shared that he and the principal were talking and were wondering why I was so mad at him. But, I wasn't mad at him at all. I didn't even have verification that he was in a new relationship at the time. This issue was about the safety of the kids. But somehow it turned to be all about me, the stereotypical angry black woman. That was the turning point for the two of us forever.

**Exhibit 1**
**33 of 93**

103

Darron had grown close to me over the past five months. He had become very involved in my world. He met my teens, took them out to dinner, and even bought them pizza many times which was helpful. He even visited my dad and his girlfriend and shared that he wanted to marry me. We didn't get engaged for nothing. We obviously had a love between us that went beyond any racial barriers. When this situation arose with the school, he had the option of saying "Hey, my girlfriend was put through a lot with my students and she just really cared about the situation." But he didn't stick up for me at all.

Why? Because like certain credit cards,  his white male

60

**Exhibit 1**
**34 of 93**

104

membership had it's privileges.



It awarded him access to cover up his wrong doing. And it

justified his scenario that I was just some jealous woman who was

upset because he found a seemingly better woman who happened

to be white. This was a perfect story. Who wouldn't believe that?

This open door was just another form of temptation the enemy of

our soul uses to reel a person into his kingdom. Darron just

couldn't see it.  The only reason why Caucasians who are true

believers see it is because they wear spiritual glasses. They use

discernment and refuse to make a date with that spirit because

61

**Exhibit 1**
**35 of 93**

105

they are wise and know where that red carpet leads. They care way too much about humanity and salvation. They know that God created all of us and refuse to get sucked into the superior/inferior complex for personal gain. But not Darron. He took a step on that red carpet and it felt good to him. It was a way out of the mess and no one would ever question him. Because after all, some of his colleagues also went down that same pathway themselves. With systems and networking elite backing them, they were almost untouchable and the offer was irresistible. Once Darron steered his colleagues, family, and new girlfriend in that direction, the transaction was sealed and his cover wasn't blown. I spoke out about this issue because it was put in my lap. I was an advocate for kids in education long before Darron and I ever met. I didn't want to be responsible for doing nothing relating to children or youth regardless of where Darron stood.

That was when Darron finally said goodbye. He didn't want to hear about what occurred and didn't want to take responsibility for anything either. He didn't have to.

62

**Exhibit 1**
**36 of 93**

106

When he wasn't willing to meet me half way or budge, I was completely heartbroken. It was a week before my birthday and he was gone. I may not have been the woman tapping on the window like the other girl. But after he left me, I missed him so very much. He might have been conditional about the marriage, but I was no flaky Jake. I was committed to working things out with him. But only if he were willing to work with me as well. But he wasn't willing.

I soon found myself at the same crossroads that I experienced in my relationship with Al. And once again, I experienced another man that thought it was easier to find someone else rather than do the work needed to make changes that would benefit both of us. Not having Darron around was like losing a piece of my soul. I had no compass for love and I was lost. I prayed for God to intervene and make changes. But the changes didn't come. I emailed Darron like a crazy woman hoping he might respond. But nothing happened. I was so broken that I went to see a Christian counselor at a local church. She was such a help and was the first

63

**Exhibit 1**
**37 of 93**

107

person to suggest that he was probably already in another relationship. I couldn't see that because my love for him was so strong. But he obviously did not feel the same way. He was a man that was use to turning love off and on like a light switch. The abuse he experienced taught him that. He stayed gone for nine long months. Then suddenly, in early November, he reached out to me again. He first began reaching out to me by emails. Then later on, he began to contact me by phone. Regardless of the avenues he took, he was missing me. His emotions were obviously conflicted and twisted since there was such an unresolved divide between us. Yet, he didn't seem to care. I tried to discuss the issues we still faced. But, he shrugged them off by saying he was seeing a counselor. I truly believed that he was sincere, but time would prove that I was wrong. Darron didn't come back to repair "us". He came back to destroy "me". And he planned to do this in a deceptive, cruel way. He already had another relationship secretly growing on the side and planned to use it as fuel against me. I was no longer his love interest. Instead,

64

**Exhibit 1**
**38 of 93**

108

he determined in his heart that I was nothing more than an insignificant black woman that he would use then never speak to again . He carried his new girlfriend on his cell phone and deep hatred towards me in his heart. His misguided anger was like a seed that he swallowed and digested until it reached the pit of his stomach. During the ten months that he was away, it was planted until it blossomed into a spirit of racism. He felt very justified in his new way of thinking and planned to take all of his anger out on me. He met me in December and spent the whole weekend with me. He took me to dinner, bought me jewelry, and then began to cry like a baby. He looked at me with these cloudy blue eyes and told me that there was no one else he loved except  me. As he sniffled, he told me that he kept hearing these conflicting voices in his head that wouldn't stop speaking to him. He was weeping so hard that I finally said, "hey, I know we are in a messed up place right now. And this is not the ideal Christ-like situation to mention God. But we need to pray. Would you like to ask Christ to come live in your heart" I asked. He then said "yes"

65

**Exhibit 1
39 of 93**

109

and we began to pray him into the Kingdom. He said he wanted to
work things out but was struggling with depression and was
trying to balance out his new medication. He made love to me for
three days and made me feel that there was hope for both of us in
restoring our engagement in the near future. Near future?

RED MEANS STOP RIGHT HERE!

66

**Exhibit 1**
**40 of 93**

110



I am not sharing this story so that anyone can sit in judgment saying "well she should have known better." The reality is that like me, there are a bunch of Christian women out there who might *know* better. Yet, in situations like these, they sometimes don't *do* better. Anytime a former fiance or boyfriend wants to see you after ten months, or after any type of distance like Darron and I experienced, you can't let them just walk back into your life and pick up where they left off. You just can't! You have to make them start over. You start over too. You should never do this alone like I did. You should always take a second person with you when you meet with your ex again for that first reunion. My issue is that in the church, everyone is running around doing missions and this and that. But dating renewal is missionary work in itself. Single people are walking around their local cities all alone. They don't

67

**Exhibit 1
41 of 93**

111

have relationship support and need assistance. We don't need people holding our hands. But having support, real support from a husband and wife team enforces accountability. How neat would it be to have a faith filled, married, stern man step up in a surprising way, put his arm around one of our exes, and say "hey buddy, lets talk". "What is your real motive for meeting with this woman today? Are you dating other ladies right now? She is my sister in Christ and I care about her." Do you think that deceiving man is going to stick around after someone has his eyes on him like that? No way! He's either going to feel obligated to explain himself. Or, he will get annoyed and leave. This is why we need our church community. Support like that creates potential to change a heartbreaking situation into hope. Adopt a single sister or brother, won't you church? They need you!

So, like I said, I was vulnerable and didn't have anyone. And right in the midst of my vulnerability, I made stupid choices. Darron deceived me that weekend and after that, the only messages he sent me were filled with comments about his parents

68

**Exhibit 1**
**42 of 93**

113

setting was probably very humiliating. And, his constant broken relationships with other women revealed the ongoing turmoil in his life. I think it played a huge role in his lashing out at me and in his becoming emotionally abusive. When Darron went after my humanity to hurt me, it was clear that he was blaming me for his circumstances. Darts were thrown and I just happened to be his latest target. He blocked me from facebook and never spoke to me again. Ten days later, I found out that he added pics on his facebook with the woman he had been serious with for some time. Even though she happened to be white, and his mom preferred her skin tone, her skin color didn't keep Darron from returning back to me. That's why racial stuff is so ignorant. It never makes sense because we are all a part of the human race. No matter how we try to label and define a person's humanity, we can't. It just is. Darron deceived me at the expense of his new girlfriend since *"their"* relationship wasn't important enough to acknowledge while he was with me. He also deceived his girlfriend by making her presence in his life insignificant as well which was very sad. All

69

**Exhibit 1**
**43 of 93**

114

in all, Darron was selfish and only cared about Darron. His actions were not solely about racism or even about his mother. Those were just more layers covering up Darron's hardening outer shell he used to protect himself. His actions only verified his need to make better choices as a 50 years old man. Nothing else could ever cover that up. His two way deception put me at risk because I didn't have the option of knowing that he was already in a sexual relationship with someone else. At least, I could have walked away or at best, used protection to avoid STD's. I trusted him ignorantly. And he took advantage of that trust. It does take two to tango and I admit where I went wrong in believing him. But it only takes ONE person to lie about the things they don't want the other partner to know about. By refusing to tell me, he took that safety option from me.

Everything this man did to get back at me was completely selfish. I had never loved any man like I loved him. Yet, he treated me with such hatred and cruelty. He placed me, his own fiance at the time, between a rock and a hard place regarding

70

**Exhibit 1**
**44 of 93**

115

many of his own issues. And when I handled the circumstances to the best of my abilities, he judged me further because my process did not meet his expectations. He wasn't showing me love. Instead, he was reminding me that his love was conditional based on whether or not I would ignore and bypass the dark areas of his life that he didn't want loves light to reveal. This was generational. But, when his family, like so may other families, chose to ignore and bypass those dark areas within their own marriage, darkness was given an access pass to flourish throughout their household. It affected Darron's life, his sister, and the lives of others around them.

Even in my imperfection and my sin, I battled to carry that light within me because of Jesus Christ. But, even repentance couldn't provide a free pass to get away with my part in this situation. After my time with Darron, I was literally sick to my stomach. It wasn't a pregnancy sickness, it was a spiritual sickness. I vomited off and on for three whole months and didn't know why. As I reached out to the Lord in prayer, I was  reminded that I was one

71

**Exhibit 1**
**45 of 93**

116

of His daughters whom He dearly loved. He then taught me about the importance of the Holy Spirit. It was given to me as a gift that wasn't meant to be tossed around back and forth like a toy. It was a spiritual organ living in my body and needed to be taken care of and respected. .Like alcohol devastates the liver, sin devastates the Holy Spirit. The Lord had to show me that I dragged the Holy Spirit into a sinful situation and the Holy Spirit will not be prostituted. When we practice sin on an ongoing basis, we drink a cup of devastation that has a poisonous aftertaste. It causes pain and takes a long time to get out of our system. I experienced a lot of dark days and nights. But, the Lord never gave up on me. His purpose for bringing Darron and I together was to expose the darkness present in both of our lives. He was hoping we both might refuse darkness by removing it from our relationship; walking instead into the light. But, the choice was ours to make individually. When Darron rejected the light, and I embraced it, I had to reach out for that light even if it meant walking alone.

72

**Exhibit 1
46 of 93**

117

*When two people truly love each other, they don't want the other person to be shoved into a dark place. They want them to be safe, away from the rocks, out of the darkness and protected.*

73

**Exhibit 1**
**47 of 93**

118

# Chapter 6



## My Healing

Who was the woman that decided that it was ok to be Martha the Martyr after a really, really bad break up? I mean, there I was lying on my back in a cold medical room at the Doctors office with my feet in stirrups. I was getting poked and prodded while having my blood drawn for an HIV/Aids test, and I was peeing in a cup to get a specimen to verify non-pregnancy. I also had to lie

74

**Exhibit 1**
**48 of 93**

Case 5:17-cv-01153-JGB-KK   Document 1   Filed 06/13/17   Page 75 of 124   Page ID #:75

119

back as a do dat machine thingy was inserted inside of me as part

of a pap smear exam to rule out STD exposure. And where was he?

Darron, I mean? He was off getting well wishes  on his new

engagement to the very woman he had deceived. Shute. I actually

felt sorry for her because at least I was one step ahead of his game

and knew about what he had done. My wait for verification on

any virus would take a full year. I had just taken my first test and

in six months, I would need to take a second. My first set of tests

revealed no pregnancy and I was relieved. I also had no traces of

STD's in my body and thanked the Lord for that first six months

of blessings, undeserved forgiveness, and grace. But I wasn't out

of the water yet. I had six more months to wait for the HIV/Aids

second test to confirm whether or not I had contracted the virus.

When Darron and I first met, we both did the responsible thing

and got tested for safety reasons. He knew how I felt about

honesty and safety. So when he deceived me anyways, he pretty

much took a shot at my life.  He and I didn't always have bad

times. We also had some really great times together. During our

75

**Exhibit 1
49 of 93**

120

time together, he and I would sit and chat about the fun times we remembered from our childhood. We both went roller skating at the same rink and never noticed each other. We both went to Lilac Lanes after school and ate their steak fries and drank soda. Yet, we never ran into each other. We both even cruised Riverside and made a bunch of ruckus with our friends shouting out to people in other cars back when we were in high school. And still, we never crossed each others paths. When we first started dating, he would take me to the local Y in a small city called Cusik and we would work out together. He would wrap my injured knee and I would sit and watch him shoot hoops until he was tired. And at night, we would sit and sing television jungles from The Brady Bunch, The Big Valley, Little House on the Prairie, and The Partridge family. He even sat with me one night and watched the corniest 70's movie that I loved called "Day of the Animals". A person would have to really love someone to sit and endure watching the scenes from that old movie. He and I were seventies kids so we laughed at the seventies outfits; the flare jeans, the men's unbuttoned shirts

*𝒩𝓎*

**Exhibit 1
50 of 93**

121

with big medallion necklaces, the visible chest hair, and corny comments all throughout the movie. During those times, we truly had fun together. I suppose this was why the big divide between us hurt me so badly. His jumping into a new relationship bothered me. The boundary issues were troubling, and so were his racial comments made to get back at me after we broke things off. That all hurt me. But what hurt me the most, and caused so much pain deep within, was that before the storm hit to separate us, he had become my best friend. That was something that he and I built together early on. It was also something that could have continued whether we chose to be together in our futures or not. He was truly a kind hearted man. He just had all of these issues that had piled up in his life that he didn't want to deal with. Instead of dealing with each issue one by one, he kept running and hiding from it all. If anyone found him out, he treated them as the enemy instead of as a loving friend that cared. When I asked him to communicate with me about the boundary issue, we could have solved it together. But when he refused and made me figure it out

**Exhibit 1
51 of 93**

122

alone, I considered a pathway that was in the best interest of those youth at the school he taught at. He might not have been the bad guy at the school but he was on the borderline of having the "choice" to be right or wrong as a teacher. If this situation didn't get corrected, what about the next more sinister guy who was given the same access to encourage his students to ignore important boundaries? That was my reasoning for responding the way I did. But when I became his enemy, he went a little too far in trying to get revenge.  He went after my emotional  and physical health, my safety, and my humanity.

*78*

**Exhibit 1
52 of 93**

123

*Markers:*



*As an adult, I am starting to recognize that some people live life as if there are no limits on what they can do to hurt the people in their lives. As believers in Christ or simply as people who just want to treat others with kindness, we need to set markers in relationships.  If you find yourself criticizing something about the other person that they cannot change like a visual disability, cancer, shorter hair, the way they look first thing in the morning, their skin color, their height, maybe their metabolism that leans towards weight gain, or water weight that they have to work on controlling how it sits on ones body, their facial features, the shape of their eyes, their shoe sizes, their fingers and toes, the shape of their head, their real breast size, their signs and symptoms from diabetes, etc..., their male body size that might be*

**Exhibit 1
53 of 93**

124

*smaller in height and build, etc...their race or nationality. These things are the markers that should be off limits. If you use them against another person, you have gone too far. So when you think of blurting out things that the other person cannot change about themselves, don't cross the line. Realize that you are at the point of no return. It's best to walk away for awhile if you have to. If you keep crossing the line, you might lose a good person for your life forever.*

Even though Darron's new life without me was none of my business, I wasn't going to remain silent like so many other ladies have been taught to do in the past. Society calls it "lady like" and respectable to bow down gracefully and keep quiet when we are mistreated in relationships. But silence means supporting that person in their ongoing deception, mistreatment, and sometimes abuse towards others. Especially when it comes to another person's health and safety. The only reason why people cheat and do the horrendous things they do in relationships is simply

**Exhibit 1**
**54 of 93**

125

because we (kind hearted and loving women and good men out there too) let them. Certain men, for example, are going to go off and have mistresses as long as they think the mistress or side chic won't say anything. But when did we ladies become the house managers of other peoples dirt? In my situation, I wanted to be the humble little Christian sweetheart that walked away quietly, trusted in God, and knew He would "one day" deal with the issues I experienced with Darron. That's all sweet and flowery if I was a robot lady with no feelings. But I did have feelings. And I was pissed off. His putting me at risk left me in danger which went beyond any normal form of relationship revenge. For days, I struggled with what I needed to do about the situation. I knew I needed to let him go and finally took the situation to the Lord in prayer. I was expecting the Lord to give me some type of step by step action plan. But instead, He only gave me a few simple words which were:

*"My child, you have to feel to heal."*

The Lord had blessed me with some really good friends to stand

81

**Exhibit 1**
**55 of 93**

126

by me during that time while I was hurting. I even had a special friend at the time who went walking with me and let me cry it all out without judgment. She wasn't a believer sitting in the church pews Sunday after Sunday. But, she was the best type of person to be there for me. She had made some mistakes in her life that would make anyone blush. But her understanding was just like that of Christs. She knew what it was like to be judged and knew how to extend the very forgiveness she once needed to receive herself. But as time went on and I was still not completely healed, every other message around me was pushing me to "get over it" and "move on". I even had one man criticize me for the time it was taking me to heal from my pain. That's when I realized that no one can rush a person through their pain. It doesn't matter whether or not it takes twelve months to three years. A person needs to expand their wings and take the time they need to heal. Once healed, they will be able to fly, and even soar and start again. When we rush another persons healing time, or rush them into new relationships, we stifle them into making other bad decisions

82

**Exhibit 1
56 of 93**

127

which hurt them even more than the pain they were already feeling. The Lord never once expected me to go on in life without feeling the pain of what I had experienced. And when I finally let go of that robot/machine status, I was finally able to cry. And when I cried everything out, and gave everything to the Lord, I kept on crying. After awhile, I started feeling like my broken heart was slowly starting to mend. All of the pain, anger, and hurt started flowing out of me through my tears. And new hope began entering in with every breath I began to take. When I started feeling better, I began to go walking for exercise. I then started purchasing clothing items that would bring more light to my appearance once again. I then joined this wonderful ladies Bible study group at a local church. I know that some churches are very impersonal when it comes to Bible study and home life and issues. They are open to sweet wonderful inspiring messages. But, they don't want anyone talking about anything personal. That was always a no, no. But this group of ladies were very different. We would get into a small circle, go over our Bible study questions,

**Exhibit 1**
**57 of 93**

128

and chat about how it pertained to our personal lives. Some responses caused crocodile tears. But every response caused healing. There was no judgment and no gossip after wards. We were just there to support each other.

I was constantly praying for restoration between my ex and I. But the Lord had a different goal for my life. Instead of restoring my broken relationship, he restored my soul. Bible study caused me to not only heal, but my soul was literally repairing itself from the inside out. It felt wonderful. And when I got strong enough, I sent a facebook message to Darron's new fiance telling her exactly what had occurred between he and I while he was dating her. It wasn't about revenge. If Jesus took care of Jezebel in 1st and 2nd Kings in the Bible after she plotted and planned against a man that wouldn't sell her his land, he would definitely take care of my experiences with Darron and everyone involved. The Lord never leaves any stones unturned. He deals with those that spitefully hurt us in His own timing and in His own way. This situation was about our bodies, what we are passing on to others, and safety

**Exhibit 1**
**58 of 93**

129

factors. We are living in a new world so we have to be responsible for others around us. I shared that I got tested and felt that she might also want to do the same for her own safety. I didn't want to make matters worse. I just didn't want one more person in this world to get away with that type of behavior. These viruses are real, and even though I was blessed to come out without receiving anything, it's never fair to intentionally put other people at risk. I wanted to make sure she was aware of all that he initiated in his pursuit of spending time with me and I sent her his emails he sent to me as verification. I also let him know that I warned her to get checked based on the reckless life he was living. I never expected a response and never spoke to him again. But I have to say that the greatest step in my healing came from exposing the truth my ex wanted to keep hidden. Hiding all that he had done, allowed him to victimize me just like his parents victimized him over the years. I was his sounding board as he blamed his first wife for this and that. And after we broke apart, his next relationship will probably be the sounding board as I am to blame for his latest this

85

**Exhibit 1**
**59 of 93**

130

or that situation. And so on, and so on, and so on. I have a feeling that this time around, Darron will be forced to live a changed life. In order to keep up his dishonest front, he will have to stay on his toes. If he doesn't, the world he created will start to unravel again. And when it comes tumbling down, and it will, he will have no one to blame but himself.

When we think of generational curses within family lines, we always think that the behaviors will stop when one family member decides to change. But sometimes it takes sincere prayer from outsiders who refuse to replay generational tapes certain families have grown accustomed to in order to initiate new beginnings and change.

Like I said before, we are all a part of the human race. And Darron will always be my brother in Christ. I saw him pray a prayer of salvation and I know he meant it. I also got to spend some quality alone time moments with Darron that were protected and untainted by the rest of the world or by family influence. The time we spent together will never be forgotten. It was the one

86

**Exhibit 1
60 of 93**

131

thing that could not be stolen and will forever be something that that no one can ever take away.  I loved him in spite of everything and only wanted to see him happy. Even if that happiness was found with someone else. Real friends tell the truth even when the other person can't see it or even when the truth hurts. I tried to be a good friend by keeping that truth front and center in our relationship. I said "no" to his behavior even as the cost of saying no meant losing him forever.

  It took me two years to work through the pain of a six month or more relationship. And it took me more time to forgive this person fully without  ever seeing him again or hearing the words "I'm sorry". When I knew that I could see him on the street one day and smile, I knew  that I had truly been set free from anything meant to harm me. And now that I am back to myself, I can honestly say that it feels good to be completely healed.

87

**Exhibit 1
61 of 93**

132

God never said that He causes "some things" to work together for good of those who love Him. Instead He said,

*"And we know that in __all things__ God works for the good of those who love Him, who have been called according to His purpose."*

*Romans 8:28*

88

**Exhibit 1**
**62 of 93**

133

# Chapter 7



# The Anti, the Un, and the Reverse

It's been one year and 13 months since that last painful

relationship experience. By God's grace, I am truly living a healed

life. The Bible does say that the older are to teach the younger .

So in this Chapter, I would like to show single  ladies exactly

what to look for in finding relationships that honor Christ. Time

to listen up! 2nd Corinthians 6:14 says *"Be ye not unequally yoked*

**Exhibit 1
63 of 93**

134

*together with unbelievers: for what fellowship hath righteousness with unrighteousness? and what communion hath light with darkness?"*

Basically, when we see the term unequally yoked, we need to teach ourselves exactly what **un** really means. Un means the reverse of something. "It is the prefix, meaning **not** or **opposite**" according dictionary.reference.com.  When we separate the word un from equally, we can easily see that the Bible is giving us clear instructions. We are not simply to **do** the opposite thing that the unbeliever does in our every day lives. But we are to **be** the opposite as well. We are to be equally yoked with believers instead of walking around being unequally yoked with unbelievers. During my Sunday school days, I remember the teachers using the analogy of a man and a woman pulling two oxen  that were strapped together side by side down a road. If one person stops pulling, the other person is left to carry the additional weight of the two animals which is not really fair. I like that analogy and it does paint a long lasting picture for a pre-teen who

90

**Exhibit 1**
**64 of 93**

135

is just learning about Christ-like relationships. But there is so much more that needs to be taught about that analogy because after all, *"it is all about the wait"*. It is about the w-e-i-g-h-t we carry in life as well as the w-a-i-t to find the right person to help us pull the oxen down the road in our pathway of life. In understanding this process, I had to to first figure out what a **Believer in Christ** is and what an **unbeliever outside of Christ** is. This is huge because if we as  believers don't recognize the difference between the two, we can easily get deceived. I've been there. I've lived it, and have definitely been deceived in the past. Let's start by getting a good look at the unbeliever according to the Bible's perspective.

**The Un Believer**

In Exodus Chapter 5 verses 1 and two, we find Pharaoh's response to Moses and Aaron.

They told him that the Lord told them to tell Pharaoh to let His people go so that they might worship Him (hold a festival in His

**Exhibit 1**
**65 of 93**

136

honor in the desert) in the wilderness.

Pharaoh then said "Who is the Lord that I should obey Him and let Israel go?"

"I do not know the Lord and I will not let Israel go." said Pharaoh.

Basically, Pharaoh didn't know the Lord. He wasn't going to listen to the Lord's demands. Therefore, a reversal or (un) of the Lord's instruction occurred. This is also true with anyone who does not believe in Christ. John 10:27 says " My sheep hear my voice; I know them. And they follow Me." It's just that simple. The reason why I have such an easy time conversing with people of other faiths is simply because  as  a believer, I get it. I don't go around demonizing people. I just know that they don't know Jesus. They don't hear His voice. Jesus doesn't know them and they don't know Him either. Therefore, they don't or won't follow Him. You know, it took me years to learn this. But, if you want to know whether or not a person is a true believer, just check out those three things. Do they hear His voice? Does Christ actually know them? Or do they share their testimony or daily experiences while

92

**Exhibit 1**
**66 of 93**

137

knowing Jesus? And, do they follow Him? Do they read the Bible?

Are they involved in hearing His word? Do their footsteps lead

them on the pathway towards Christ? In considering these

questions, I found that it is better not to scan the person or grill

them mercilessly about it. Just take your time. Look and see about

that person's life. And even before looking into their life, I think

it's best to look into our own lives. We need to make sure we are

living in such a way that we can hear His voice. I know that when

I entered the relationships I got involved with, I was hearing

God's precious voice but purposely blocked it out. I knew the

relationships I was in were not leading me towards Christ. But,

since I didn't want to lose the men I was involved with, I pushed

His voice aside. The problem with pushing His voice aside is that

you lose the closeness Jesus has to offer. You lose wisdom and

information He is trying to impart to you for your protection. He

doesn't want us wandering off in the wilderness without His

protection. Believe me, there are men that will leave you

somewhere on a cold ground naked, uncovered, and lost in

93

**Exhibit 1**
**67 of 93**

138

Siberia. But, because God loves you so much, He will hear you crying from afar off. He will run to you and cover you with the warmth of His love. He will cherish you  because that's what a Father's love is suppose to do. It is His wish to carry you out of any dark cold place. He wants to protect you, guide you, and keep you safe resting under His umbrella. But He can't express His love towards us as His daughters if we push Him away and tune out by refusing to listen to the wisdom He is trying to impart to us.

**I Know Who God Is But, I Don't Really Serve Him**

These are the type of men I run into all of the time. They know about God, and will even go to church to learn more about Him. But for some reason, it sometimes takes this big lightening jolt type of conversion to knock them off of the fence they were

94

**Exhibit 1**
**68 of 93**

139

straddling before making their decision to finally walk with God.

Lets look at a conversion where an unbeliever is coming to know

Christ. The Saul to Paul example. In Acts Chapter 9 verse 1,

"Saul was still breathing out murderous threats against the Lord's

disciples." As you read further on in this story, you will see that

eventually, Saul went the other way. He went from being an

unbeliever named Saul to a believer fired up for the Lord where

his name was later changed to Paul. This conversion did not occur

without divine intervention and God's personal presence and

visitation into his life.

"Saul asked the high Priests/leaders for letters to imprison any

disciples in Jerusalem. He was on a journey and had a mission to

get as many believers as he could whether they be men or women.

"So, while he was on his way in that (wrong, anti-, un) direction,

he had a personal encounter with Jesus.

Acts 9; verse 3

As he neared Damascus on his journey, a light from heaven

flashed where? Around him, so it encircled him. He fell to the

95

**Exhibit 1
69 of 93**

140

ground and heard a voice say "Saul, Saul why do you persecute Me?"

God kind of freaked Saul out a little bit because he didn't seem so tough and threatening at that moment. "Who are you, ....Lord?" Saul asked.  Saul didn't say "who are you" did he? Instead, he asked "Who are you *Lord*?" So, we know that deep down, Saul, whose name was later changed to Paul, knew exactly who the Lord  was. He just hadn't yet had his personal encounter with God until this moment.  Saul knew he was dealing with a Superior being (before) he built a personal relationship with Him.

Then God said "I am Jesus whom you are persecuting."

God then said, "now get up and go into the city. and you will be told what you must do."

So after God verified who He was to Saul, and Saul acknowledged that God was truly God the Father, God gave him immediate instructions.

The men traveling with Saul were speechless. That shows how powerful this conversion and conversation was.

96

**Exhibit 1**
**70 of 93**

141

The Bible says that they heard the sound but did not see anyone. This was confirmation that this conversion moment was strictly tailor made for Saul as he was transforming into one of the Lord's greatest disciples named Paul.

Paul's example is a message to women and to men that are believers that God will personally present himself before _all_ men so that they might have a choice to acknowledge and serve Him _or_ not. We can trust that God will visit our loved ones when we pray and ask Him to. We can feel confident that He does hear our prayers.

We also have to realize that it's not our job to step in and wear ourselves down trying to play the God role.  When we do pray, and our loved one's continue to  reject the Lord's prompting like Saul in the story could have done, we need to leave them in the hands of God. I learned that I need to do the same in dating relationships. I use to spend so much time trying to encourage my boyfriends to walk with Christ. And the funny thing is, they knew what their stance was much more than I ever knew mine. They

**Exhibit 1**
**71 of 93**

142

didn't compromise their disbelief in God. Yet, now that I look back, I can see how much I compromised my belief in Him to remain in relationship with them **_On Their Terms_**. This is what needs to change in our behavior as woman who are trying to walk out our faith while dating and praying for a husband to enter into our lives. We need to be as sure about our devotion to living out Gods will as certain men are in living outside of it. We need to take a stand and stick to it.

I personally decided to finally take my stand for Christ after a whole year of being single again. I started building a conversation with this particular man that was very interested in me. There use to be a time where I was so grateful for someones interest in me. But this time proved to be different. We were having a great conversation at first. He even invited me to go to dinner with him. But as we continued to talk, he started swearing and making rude comments about off the wall issues. He was referring to women as being bitches (meaning female dogs = animals) and talking about their having attitudes when they were on their periods and

98

**Exhibit 1
72 of 93**

143

so on. Talking to him became almost unbearable. It got so bad that I literally got a headache. I knew he was not someone I wanted to spend time with. I also knew he wasn't a true believer. It wasn't his swearing etc., that got me turned off to him. It had to do with the simple fact that he didn't hear Gods voice so he wasn't one of His. He didn't know Jesus, and he certainly wasn't following Him down a positive pathway in the conversations he wanted to have with me. I then quickly canceled our dinner date and told him I wasn't interested. Now, here's a strange twist every believing woman should be aware of. Since this guy knew I was a believer, he tried to appeal to my faith in his attempt to somehow reel me in. He mentioned that even Jesus had a few good men that He discipled.  And I responded by saying "Yes He did. But remember, *He* discipled the men himself. It's not my responsibility to draw a man to the Lord when He's the only one that can draw them." After that, this man finally left me alone. In the past, I use to go out with those type of unsaved guys knowing at some point that they were not walking at all with Christ. This

99

Exhibit 1
73 of 93

144

time around, things have changed. I now refuse to mercy or

ministry date anyone. If they are not saved, the church will

always be an option for them if they desire to get involved. I will

share the gospel in group settings with fellow church members. I

might even have to hang with people that are unsaved in work

settings involving team building lunches etc... But as far as one

on one dating goes, I have become very careful. Even the time

frame with an unsaved man wanting to date is an issue. Everyone

has to set their own time span when spending time with

unbelieving men wanting to date. But my time frame is now

down to three hours max. I am willing to invite a man to a church

function that might last an hour and a half to two hours. I might

even go to have a sandwich or a bite to eat with that person as

well. But they will always be considered just a friend in my eyes.

If they ever decide to walk with Christ, that's a plus. There's

another one for the Kingdom of Heaven. But if they don't, they

are not obligated and neither am I. Friendship will always be all

there will ever be between us.  My new goals these days are to

100

Exhibit 1
74 of 93

145

spend my time at home or on my hobbies instead of spending

time building a non-Christ oriented fruitless relationship. Our

time as believing women has to be spent promoting who we say

we believe in. When we say we believe in God, we have to start

promoting Him in our relationships and by our actions. We have

to be as bold in promoting Christ as some of the female

entertainers are today in promoting their belief in the occult

through their music.

**The Believers Range Grid**

When we, as believing women, date unsaved men, this is the

range in which they can go even when they seem sweet, nice, and

unbelieving.


The **I'm A Believer Section** means I am born again, I am not

perfect but I do my best to serve the Lord.  I am His Child, I

belong to Him, and  my destiny is in the Kingdom of God forever.


The **I Know Who God Is But....I Don't Really Serve Him**


101

**Exhibit 1
75 of 93**

146

**Section** means I am lukewarm about my feelings for Christ. I know who God is. I claim to be a Christian, I'll even go to church every now and then. But I am the master in my own life. I do what I want to do and don't follow any rules accept my own.

The **I Don't Believe in God But I Don't Mind If You Do Section** means exactly what it says. This person doesn't believe in God and doesn't care whether or not you have a faith. Just don't talk to them about how you feel about your faith. They might have their own belief in another deity, etc.. But when it comes to God, they don't believe, they don't agree with it, and they don't want to hear it.

The **I don't believe in God. And if there is a God, I hate Him Section** also means exactly what it says. This person is very anti-God and may become antagonistic in a discussion where God is mentioned. There is an extreme version of everything in life. This particular person may also have an extreme that can lead to

102

**Exhibit 1**
**76 of 93**

147

satanic worship and preference.

While I realize there is no use in dating a person based on our differences, I tend to be a good listener and I like to hear these people have to say. I often find that a few have experienced hardships due to one or two jack asses within the church who ran around claiming to be true believers but lived a life at home that verified they were not. These so called believers were abusive, cruel, and have used the Bible to justify behaviors that have nothing to do with Christ and God's love. Their negative influence was so detrimental in the  lives of some that they turned away from God completely. Whenever I come across these stories of extreme abuse these now adults have suffered at the hands of few of these wolves in sheep's clothing, it has broken my heart. I believe this is the very stumbling block Jesus talks about when He says ;

*"But Jesus called the children to Him and said "Let the little children come to me, and do not hinder them, for the kingdom of God belongs to such as these."*

103

**Exhibit 1
77 of 93**

148

*Luke 18:16*

What The Bible Really Says About Anyone That Hurts A Child:

*" But if anyone causes one of these little ones who believe in Me to sin, it would be better for him to have a large millstone hung around his neck and to be drowned in the depths of the sea."*

*Matthew 18:6*

It was never God's intention to see these children or families suffer through abuse at the hands of anyone claiming to know Him or to be used to do anything according to His will. Sometimes I think abusers mistreat their prey just to take away their innocence because they feel that at one time in their own lives, someone took their innocence. These people want to block children from ever trusting in the love and protection that comes from God. They obviously don't reverence or believe in God the way they claim because they are arrogant enough to put their hands on children without considering the repercussions coming their way.

104

**Exhibit 1**
**78 of 93**

149

Even after passing on this information, the discussion tends to move to their wanting explanations about the world's ills and why God didn't do this or that to change things. I always admit that I don't have every answer because I am still learning about the world and what makes it tick. But, what I do share is that God loves these people and always has. My only sadness is that I might not get to spend eternity with so many of these people because of the differences in what we believe. This tends to be my opportunity to share the gospel if the person is open to hearing it.

# Chapter 8

105

**Exhibit 1
79 of 93**

150



# The Covering

What is the Covering? The covering is a faith covering of Gods protection surrounding our lives. When it comes to dating, I can only truthfully speak for myself. Yet, I know I am not alone when I say that so many believing women like myself, have not fully been prepared to stand for our faith in Jesus Christ. We have listened to Bible stories about Queen Esther, Ruth and Boaz, and Rachel and Jacob. And although those stories have significance in giving us strength and direction, they don't always equip us with knowledge on how to deal with what we encounter as believers in today's world. Today is our day to stand and understand the

106

**Exhibit 1
80 of 93**

151

reasons for our faith and our hope. We really need to expand our horizons within the scriptures to learn about relationship deception, sin, and the outcomes when we fall away from God's umbrella. We already know that there are good men out there that love Jesus and are committed to doing His good will. Those are the men we want to enter into our lives. But we have to be able to recognize them when they cross our paths and appreciate their presence just as they need to appreciate ours. As we are sifting through the masses in the meantime, we need to be equipped and aware of both good and bad intentions. We need to know and accept that there are men and women out there that are actually despicable and will pre-plan dating situations to our harm. One good example of this is the full story of Sampson and how he came to encounter Delilah in the The Book of Judges Chapter 13. Society sometimes considers this story to be one of the greatest love stories ever. But, our Bible clearly tells us that this was a story about lust, deceit, and manipulation for money. Delilah didn't care two cents about Sampson. Love definitely had nothing

107

**Exhibit 1
81 of 93**

152

to do with it. Yet, she made love to him as if he mattered in order to get something from Sampson. In this case, it was information about the source of his strength. God's daughters need to recognize this difference. If we don't recognize the charade and miss it, our heart will get crushed under the feet of an uncaring person. I know Sampson was a man. But he definitely had feelings. I am sure that his heart was torn by the deception he experienced from the woman he loved and thought he could trust. Sampson's parents tried to warn him to stay away from these women and their people but he would not listen. And, eventually, his attraction towards the Philistine women led him to his death. It's hard to imagine that a person you fall in love with and trust could set you up for a situation so extreme as death. But, since I saw first hand what being put at risk was like, I know it's actually possible. Sampson's father in law, who was a Philistine, just assumed that Sampson hated his wife. He then gave her to one of his wedding attendants without even consulting Sampson. He then tried to remedy the situation by offering Sampson his

108

**Exhibit 1
82 of 93**

153

younger daughter instead. Who meddles in a situation like that? Dysfunctional parents do. And who listens to their sometimes ignorant demands? The dysfunctional children they raise. A similar situation involving family ties happened between Rachel, Leah, and Jacob in the Bible. And this is something that we as believers need to be aware of. We just don't get into a relationship with one person. Their family, their history, and their spiritual walk or lack of is involved and will affect our lives if we are not prepared . We need to recognize and discern spirits that are incompatible with the Holy Spirit that dwells within us. When thinking of my past experience with Darron, I came to realize that he had the choice to walk away from his family generational issues. But instead, he chose to walk towards continual patterns of victimization. When we met, I was the sounding board for all of the "this and that" complaints he had about his ex-wife and previous girlfriend. After we broke up, I am confident that I became the "this and that" target for everything that took place in our relationship. And as the pattern continues, I am sure the next

**Exhibit 1**
**83 of 93**

154

person will be blamed, and so on and so on. This is why it is so important to take the time in relationships to see and observe which way the person you are dating might go in dealing with generational issues. If they refuse to get help or refuse to walk away from destructive patterns where they need to acknowledge their own involvement in past relationships, it should become a warning sign to you. It should also give you time to walk away from relationship building without getting too involved or hurt. So, what are the steps in getting prepared in our relationships as believers and daughters in Christ? Before you start to date, make sure you:

1.     **Know Without a Shadow of a doubt who Jesus Is**

John  3:16 states that **Jesus is the Son of God-**

*"For God so loved the world that He gave His one and only Son, that whoever believes in him shall not perish but have everlasting life."*

**Exhibit 1
84 of 93**

155

He's Our Mediator

*"For there is one God and one mediator between God and men,*

*the man Christ Jesus, who gave himself as a ransom for all*

*men-the testimony given in it's proper time."*

*1 Timothy 2:5 and 6*


2.     **Know what His Purpose Was and Still Is today**

Isaiah 61 reminds us that ...He came to:

*preach the good news to the poor,*

*to bind up the brokenhearted*

*to proclaim freedom for the captives*

*and release from darkness for the prisoners*

*to proclaim the year of the Lords favor*

*and the day of vengeance of our God*

*to comfort all who mourn*

*and provide for those who grieve in Zion*

*to bestow on them a crown of beauty*

*instead of ashes*

**Exhibit 1
85 of 93**

156

*the oil of gladness*

*instead of mourning*

*and a garment of praise*

*instead of a spirit of despair*


**He Came to Be Our Salvation and to Leave Us His Holy Spirit**

*Matthew 28:18-20 states,*

*"Then Jesus came to them and said, All authority in heaven and on earth has been given to me. Therefore, go and make disciples of all nations, baptizing them in the name of the Father, and of the Son, and of the Holy Spirit, and teaching them to obey everything I have commanded you. And surely, I am with you always, til the very end of the age."*

3. **Know who You Are In Christ**

*Just so you know, the Bible says ... "whoever touches you touches the apple of His eye" Zechariah 2:8.*

**Therefore, you are the apple of His eye.**

**Jeremiah 1:5 also says** *"Before I formed you in the womb I*

112

**Exhibit 1
86 of 93**

157

*knew you, before you were born I set you apart; I appointed you*

*as a prophet to the nations."*

Therefore, as His child, you are someone Jesus knew before

you even entered your mothers womb. He set you apart from

the world and He appointed you.

4.       **Know what His Purpose and Plan is for your life**

*Jeremiah 29:11 states: "For I know the plans I have for you:*

*declares the Lord, "plans to prosper you and not to harm you,*

*plans to give you a hope and a future."*

And as you grow  in the knowledge of Christ by reading His word;

1.       **Sift through what is out there** and enter through the

narrow gates in your dating process.

2.       **Don't travel down any of those dating paths mentioned.**

They only lead to heartache because they are deceptive. Their

only goal is to devastate you or take you out in one way or

113

**Exhibit 1
87 of 93**

158

another.

3.      **Take your time** to date the person you choose for at least 6 months to a year before agreeing to get engaged. Remember that it's so important to slow down and get to know each other. Allow time to really be that friend that lets the two of you really see each other. When I met Darron, I prayed and asked the Lord to show me who he was. It took a lot of time, stress, heartache, and a year and a half to see exactly who this man was. But, I did ask and did receive the whole truth about Darron. Therefore, I can never say that God didn't answer my prayers.

4.      **Keep your body out of it until marriage becomes your outcome.** In my last two relationships mentioned, I gave my whole body because it was mainly what they desired as part of our relationship. But was it what I wanted without marriage between the two of us? No. I had only dated three men in my lifetime. The first one was nothing serious nor physical. But with both Al and Darron, my body was very much involved. And, even after I shared this gift of my body with them, because our bodies

114

**Exhibit 1
88 of 93**

159

are gifts to be shared with our husbands,  I left both relationships
empty handed.

Darron still found it easy to watch me plan our wedding while he
had already started building a marriage nest with the woman he
eventually married. So my body meant nothing to him and there
were no guarantees. Society tries to make daughters of Christ feel
anxious and worried as if we will lose the man we love if we don't
give in to sex and live by someone elses  rules and desires. But, I
learned that any man who conditionally demands a lifestyle in
spite of my desire to walk faithfully with God, was never mine in
the first place. He has no respect for me and definitely has no
reverence towards my faith.  If he was never mine through
marriage, then my body should never be shared with him at any
time. Giving in to keep a man in our life is another lie from the
enemy. These men are not going to die of sexual starvation.
Please! The truth is, our time spent in building a friendship can be
enough for one man. They can wait for marriage to share a
lifetime of uninhibited sex that involves love and commitment

115

**Exhibit 1
89 of 93**

Case 5:17-cv-01153-JGB-KK   Document 1   Filed 06/13/17   Page 116 of 124   Page ID #:116

160

and so can we. Remember that when they are serious about

marrying, and know the two of you will have a lifetime of

intimacy, they won't mind waiting. When anyone tries to rush you

into it, it's not because you are so sexy or irresistible. It's because

they are only looking for something temporary. This is why God

wants us to remain under His umbrella. He's not trying to steal

our opportunities for happiness. Rather, this loving God of ours is

trying to cover and protect us in the midst of a world that wants

us uncovered, heartbroken, and exposed. Our Lord doesn't want

us to get lost in darkness. Instead, He wants to lead us out of

darkness so that we can remain in His glorious light. Giving us

direction is a privilege He honors as our Shepherd.

I know some men out there make us feel unworthy when

they dump us mercilessly or deceive us in harsh ways.

In spite of what they do, just know that God loves you so

much. He allowed your presence to stand in the midst of

the unloving. And when their unloving behavior comes

back upon them one day, they will have to deal with

116

**Exhibit 1**
**90 of 93**

161

someone who doesn't treat them as well as you did. There will never be another you. They will have to ask the next person to do what came naturally from you out of the genuineness of your heart. Women of God, don't ever forget that God gave you that.

You will be the gem they will search and search to find but will never again obtain because they didn't recognize or appreciate what they had until it was gone. All that they will ever find is little fragments of the gem stone you are. God made you valuable which is something no one can ever take away.

God wants to continue to be the guiding compass that leads you into a life of hope, relationship success, and into a brighter future with Him. I lost my way in finding a comfortable place to rest my love in these most recent years. When I finally placed the love I had to give into the Lords hands, I realized God was the one Man that could always be trusted. He would never dump me for another, throw me aside, nor deceive me. He loved me then, and continues to prove His love for me even today. He is the

117

**Exhibit 1**
**91 of 93**

162

everlasting love I had been searching for all along.

## The Compass

We all need a place

to rest our love

It's a love freely given

and comes from above

Its willing to be shared

with one person forever

it doesn't judge, but naturally

makes another want to do better

Its pure love that's sincere

it cares, it's everlasting

it commits itself, it's trustworthy

it's not temporary or passing

118

**Exhibit 1**
**92 of 93**

163

This love has a compass

purchased by paying a price

the owner of the compass

Is none other than Jesus Christ

It's chained around His neck

over the chest to never depart

if love ever loses it's way or gets lost

the compass leads us back

all the way to The Owners heart.



119

**Exhibit 1**
**93 of 93**

Exhibit 2

**EXHIBIT 2 LODGED WITH THE COURT**

Exhibit 3

**Stahl, Eric**

| | |
|---|---|
| **From:** | tia griffin <insource_7@hotmail.com> |
| **Sent:** | Friday, July 07, 2017 7:44 AM |
| **To:** | Stahl, Eric |
| **Subject:** | RE: Federal Court Hearing EDCV17-01153 |

And I will respond as usual and will remind the court that I was willing to communicate once you signed in as counsel. I will also provide proof that I informed you of this in writing.
Thanks. -Tia Griffin

Sent from my Assurance Wireless Phone.

"Stahl, Eric" <ericstahl@dwt.com> wrote:

Ms. Griffin:

We have not filed a response to the complaint, because no response is due yet.  Defendants' initial response, which we intend to file next week, will be a timely motion to dismiss as provided by Federal Rule of Civil Procedure 12(b)(6).

The meet-and-confer requirement applies here.  Please review Local Rule 7-3, which sets out the meet-and-confer obligation.  It applies to "any motion," including motions to dismiss.  (There are some exceptions listed in the rule, but a motion to dismiss is not one of the exceptions.)  The obligation does not depend on whether a party has previously appeared or filed any papers in the case.

Accordingly, Rule 7-3 requires that we contact you to "discuss thoroughly... the substance of the contemplated motion and any potential resolution."  We remain available to conduct the required conference telephonically.  If you are willing to confer, please respond by email with some available times over the next couple of days.  If you are not willing to confer, we will so advise the Court when we file our motion.

**Eric M. Stahl** | Davis Wright Tremaine LLP
Admitted in Washington & California
Email: ericstahl@dwt.com | Website: www.dwt.com
Bio: www.dwt.com/lawdir/attorneys/StahlEric.cfm

1201 Third Avenue, Suite 2200 | Seattle, WA 98101
Tel: (206) 757-8148 | Fax: (206) 757-7148

865 S. Figueroa Street, Suite 2400 | Los Angeles, CA 90017
Tel: (213) 633-6861 | Fax: (213) 633-6899
Anchorage | Bellevue | Los Angeles | New York | Portland | San Francisco | Seattle | Shanghai | Washington, D.C.

---

**From:** tia griffin [mailto:insource_7@hotmail.com]
**Sent:** Thursday, July 06, 2017 10:07 AM
**To:** Stahl, Eric
**Subject:** RE: Federal Court Hearing EDCV17-01153

I didn't receive a response to my complaint. Did you already submit your response to the court? If not, I am not obligated to talk to you. Once you have responded, we can meet based on court expectations.

Tia Griffin/Plaintiff
5593075267 is working
Sent from my Assurance Wireless Phone.

"Stahl, Eric" <ericstahl@dwt.com> wrote:

1

**Exhibit 3**
**1 of 6**

## Stahl, Eric

| | |
|---|---|
| **From:** | Stahl, Eric |
| **Sent:** | Wednesday, July 05, 2017 4:42 PM |
| **To:** | 'tia griffin' |
| **Cc:** | Sager, Kelli |
| **Subject:** | RE: Federal Court Hearing EDCV17-01153 |

Ms. Griffin,

In accordance with the court's meet-and-confer requirements, I attempted to call you this afternoon to discuss defendants' pending motion to dismiss your complaint.  Neither number I have for you (559-721-8712 and 559-307-5267) was accepting incoming calls.

We remain available to discuss the grounds for the motion, but need your cooperation to do so.  Please let us know when you are available to confer, and where we can reach you.

Regards,

**Eric M. Stahl** | Davis Wright Tremaine LLP
Admitted in Washington & California
Email: ericstahl@dwt.com | Website: www.dwt.com
Bio: www.dwt.com/lawdir/attorneys/StahlEric.cfm

1201 Third Avenue, Suite 2200 | Seattle, WA 98101
Tel: (206) 757-8148 | Fax: (206) 757-7148

865 S. Figueroa Street, Suite 2400 | Los Angeles, CA 90017
Tel: (213) 633-6861 | Fax: (213) 633-6899
Anchorage | Bellevue | Los Angeles | New York | Portland | San Francisco | Seattle | Shanghai | Washington, D.C.

---

**From:** Sager, Kelli
**Sent:** Sunday, July 02, 2017 3:08 PM
**To:** 'tia griffin'
**Cc:** Stahl, Eric
**Subject:** RE: Federal Court Hearing EDCV17-01153

Ms. Griffin –
I'd like to schedule a meet-and-confer telephone conference to dismiss defendants' motion to dismiss your federal copyright lawsuit.  Please let me know when you are available, either after 3:00 p.m. tomorrow (July 3), or any time from 10:00 a.m. to 5:00 p.m. on Wednesdayt, July 5, and I will circulate a call-in number.
I look forward to hearing from you.
Sincerely,
Kelli Sager

**Kelli Sager** | Davis Wright Tremaine LLP
865 S Figueroa Street, Suite 2400 | Los Angeles, CA 90017
Tel: (213) 633-6821 | Fax: (213) 633-6899
Email: kellisager@dwt.com | Website: www.dwt.com

Anchorage | Bellevue | Los Angeles | New York | Portland | San Francisco | Seattle | Shanghai | Washington, D.C.

**From:** Sager, Kelli
**Sent:** Monday, June 26, 2017 10:27 AM
**To:** 'tia griffin'

1

**Exhibit 3**
**2 of 6**

**Cc:** Stahl, Eric
**Subject:** RE: Federal Court Hearing EDCV17-01153

Tia –
Thanks for your response. If I'm understanding you correctly, you are refusing our request that you agree to postpone the deadline for defendants to respond to your federal lawsuit to August 14; instead, your position is that the parties should abide by the deadlines in the Court rules. If I am incorrect in my interpretation of your email, please let me know.
Sincerely,
Kelli Sager

**Kelli Sager** | Davis Wright Tremaine LLP
865 S Figueroa Street, Suite 2400 | Los Angeles, CA 90017
Tel: (213) 633-6821 | Fax: (213) 633-6899
Email: kellisager@dwt.com | Website: www.dwt.com

Anchorage | Bellevue | Los Angeles | New York | Portland | San Francisco | Seattle | Shanghai | Washington, D.C.

**From:** tia griffin [mailto:insource_7@hotmail.com]
**Sent:** Saturday, June 24, 2017 8:13 PM
**To:** Sager, Kelli
**Subject:** Re: Federal Court Hearing EDCV17-01153

Just so we are clear and there are no misunderstandings, your email comes to my inbox but Stahl's is for some reason not always coming to my inbox. You are definitely not being blocked as you apparently assumed. Furthermore, I am simply following the court rules pertaining to service. As far as any side agreements, I abide by the two Judges requirements as to when the Defendants are required to respond to the courts. I am looking forward to having all required discussions with you and am looking forward to responding to your motions. Thanks Kelli.

Tia Griffin/Plaintiff

Sent from Outlook

**From:** Sager, Kelli <kellisager@dwt.com>
**Sent:** Friday, June 23, 2017 7:18:37 AM
**To:** 'insource_7@hotmail.com'
**Cc:** Stahl, Eric
**Subject:** FW: Federal Court Hearing EDCV17-01153

Ms. Griffin –
Eric Stahl is currently traveling, so I'm responding to your email below.

Mr. Stahl has already told you that we will be representing the **same defendants** in your new federal lawsuit as we represented in your state court lawsuit that was dismissed. There is no requirement that we "file" something with the court saying that, nor is it improper for the parties (or in this case, defendants' counsel and a litigant representing herself) to communicate before anything is filed with the court.

To the contrary, it is not only expected that we will communicate with you before we formally appear on behalf of any of the defendants, it is <u>required</u> that we attempt to do so before filing a motion to dismiss your lawsuit. Although I understand that you are not an attorney, as a litigant in the federal court, you will be expected to be familiar with and abide by the court's rules, which can be found on the Central District of California's website.

Concerning Mr. Stahl's proposal: If you prefer to have each of the defendants served directly, rather than entering into our proposed agreement about service and the timing of the defendants' response, you certainly are free to do that,

2

Exhibit 3
3 of 6

although there is no reason for you to impose that service burden on federal marshalls, given the proposal in Mr. Stahl's email below.

But in any event, we have asked you to agree to a date of **August 14** for all the defendants to respond to your federal complaint.  Are you willing to agree to that date?  If not, we will proceed accordingly.  I look forward to hearing from you.

Finally, it would also be appreciated if you would unblock emails coming from our firm to you, so that we have a means of communicating with you promptly about your lawsuit, rather than having email correspondence from our firm to you go into a "junk" folder.
Sincerely,
Kelli Sager

**Kelli Sager** | Davis Wright Tremaine LLP
865 S Figueroa Street, Suite 2400 | Los Angeles, CA 90017
Tel: (213) 633-6821 | Fax: (213) 633-6899
Email: kellisager@dwt.com | Website: www.dwt.com

Anchorage | Bellevue | Los Angeles | New York | Portland | San Francisco | Seattle | Shanghai | Washington, D.C.
:

> **From:** tia griffin <insource_7@hotmail.com>
> **Date:** June 22, 2017 at 3:44:44 PM PDT
> **To:** "Stahl, Eric" <ericstahl@dwt.com>
> **Subject: Re: Federal Court Hearing EDCV17-01153**
>
> Mr. Stahl,
>
>
>     I only just found this in my junk mail today. As usual, I have submitted my complaint and summons to the Agents of Record listed at the Secretary of State's website. And once again, when you respond to the Federal District Court, I will have knowledge that you are representing the Defendants in this Federal case. Once again, I will not be signing any separate forms with you as this is not court protocol, nor is it necessary. Thank you.
>
>
>
>     Tia Griffin/Plaintiff
>
>     Federal Court Case: 5:17cv-01153-JGB-KK
>
>
>
>     Sent from Outlook

_____

**From:** Stahl, Eric <ericstahl@dwt.com>
**Sent:** Wednesday, June 21, 2017 5:48 PM

**Exhibit 3**
**4 of 6**

**To:** insource_7@hotmail.com
**Cc:** Sager, Kelli
**Subject:** FW: Federal Court Hearing EDCV17-01153

Ms. Griffin,

I have not heard back from you about this.  All of the Defendants would be willing to allow my firm to accept service on their behalf, if you agree to August 14 as the deadline for their response to the complaint.

If that is acceptable to you, we would need to let the court know.  I have prepared the attached stipulation and order to that effect.  If you agree, please sign the stipulation and return to me; we will countersign and file it with the Court.  If you have changes, please let me know.  (An alternative way to do this would be for you to follow the waiver of service process set out in Federal Rule of Civil Procedure 4(d).  The stipulation will be  simpler for all concerned but we would also respond to a proper waiver of service request, if you send one.)

Finally, please copy Kelli Sager on any response as I will be out of the office and largely unavailable from tomorrow until July 5.

Regards,

**Eric M. Stahl** | Davis Wright Tremaine LLP
Admitted in Washington & California
Email: ericstahl@dwt.com | Website: www.dwt.com
Bio: www.dwt.com/lawdir/attorneys/StahlEric.cfm

1201 Third Avenue, Suite 2200 | Seattle, WA 98101
Tel: (206) 757-8148 | Fax: (206) 757-7148

865 S. Figueroa Street, Suite 2400 | Los Angeles, CA 90017
Tel: (213) 633-6861 | Fax: (213) 633-6899
Anchorage | Bellevue | Los Angeles | New York | Portland | San Francisco | Seattle | Shanghai | Washington, D.C.

---

**From:** Stahl, Eric
**Sent:** Wednesday, June 14, 2017 10:22 PM
**To:** 'tia griffin'
**Subject:** RE: Federal Court Hearing EDCV17-01153

Dear Ms. Griffin,

I am discussing with my clients whether they will authorize my firm to accept service on their behalf.  Please let me know where you filed the complaint (i.e. which court) and the case number.

Also, my clients' willingness to accept service likely would depend on us reaching an agreement on scheduling.  I would suggest August 14 as the due date for defendants' response to the complaint.  Would you consider that?  (FYI I suggest that date because it's 60 days from your request, which is the time a defendant normally has to respond under a formal waiver of service.  See Federal Rules of Civil Procedure Rules 4(d) and 12(a)(1)(A)(ii).)

I look forward to your response.

**Eric M. Stahl** | Davis Wright Tremaine LLP
Admitted in Washington & California
Email: ericstahl@dwt.com | Website: www.dwt.com
Bio: www.dwt.com/lawdir/attorneys/StahlEric.cfm

4

**Exhibit 3**
**5 of 6**

1201 Third Avenue, Suite 2200 | Seattle, WA 98101
Tel: (206) 757-8148 | Fax: (206) 757-7148

865 S. Figueroa Street, Suite 2400 | Los Angeles, CA 90017
Tel: (213) 633-6861 | Fax: (213) 633-6899
Anchorage | Bellevue | Los Angeles | New York | Portland | San Francisco | Seattle | Shanghai | Washington, D.C.

---

**From:** tia griffin [mailto:insource_7@hotmail.com]
**Sent:** Tuesday, June 13, 2017 3:34 PM
**To:** Stahl, Eric
**Subject:** Federal Court Hearing EDCV17-01153

Dear Mr. Stahl,

   My name is Tia Griffin. I have filed my case in Federal Court today regarding Copyright infringement and wanted to ask if your law firm, Davis Wright Tremaine, LLP. would be representing Jordan Peele, Blumhouse Productions, QC Entertainment, and NBC Universal Media, LLC. I would appreciate verification for service. Thank you.

Tia Griffin/Plaintiff

**Exhibit 3**
**6 of 6**

Exhibit 4

Tia P. Griffin
c/o D. Griffin
2442 Iowa Avenue #P14
Riverside, CA. 92507
559-721-8712

FILED
SUPERIOR COURT OF CALIFORNIA
COUNTY OF RIVERSIDE

MAR 03 2017

C. Mundo

SUPERIOR COURT OF THE STATE OF CALIFORNIA

FOR THE COUNTY OF RIVERSIDE

Tia P. Griffin

Plaintiff,

vs.

Jordan Peele, Perfect Word Pictures,
Blumhouse Productions & QC Entertainment

Defendant

Case No.: RIC 1703920

DOCUMENT TITLE: Literary Copyright
Infringement

Please see attached complaint. Thank you.

Dated 3/3/17

Your Name/Signature

DOCUMENT TITLE: - 1

**Exhibit 4**
**1 of 11**

SUPERIOR COURT OF CALIFORNIA

FOR THE COUNTY OF RIVERSIDE


| | | |
|---|---|---|
| TIA GRIFFIN | ) | Civil Action No. |
|     PLAINTIFF, | | |
| | ) | |
|     vs. | ) | Re:   LITERARY COPYRIGHT |
| | | INFRINGEMENT |
| JORDAN PEELE,  PERFECT | | |
| WORLD PICTURES, | | |
| BLUMHOUSE  PRODUCTIONS | | |
| & QC ENTERTAINMENT) | | |
|     DEFENDANTS | | |

**Exhibit 4
2 of 11**

As Plaintiff,  I, TIA GRIFFIN, Author of the book "The Covering", request that the courts respond to my demand for recourse whereby my Literary Copyrighted Work from my book called "The Covering"   TXu001922667 / 2014-05-11 , was infringed upon by the Defendants,  JORDAN PEELE,  PERFECWORLD PICTURES, BLUMHOUSE PRODUCTIONS & QC ENTERTAINMENT. I will explain the infringement practices, access where my work was available Nationwide, in Europe, and advertised on social media. I will also provide factual examples of this infringement on the part of the Defendants to prove my accusations.

### Introduction

The infringement took place from Chapter 5 of my book on page 74. This Chapter was called "My Heartbreak". In this section, I spoke of  my experience as an American black woman involved in a relationship with a white male at the time. In this section of the book, I explained our experience while driving out to Newport Washington from Spokane to meet this man's parents for the first time. I stated and I quote from my book " One month into our relationship, Darron invited me and my teens to spend Thanksgiving with he and his family. My teens didn't want to go and really didn't seem to want me around. They wanted me to cook and get everything nice and wonderful for

**Exhibit 4**
**3 of 11**

the holiday. But, because they knew I had spent so many years alone, they encouraged me to go ahead and get to know this new man in my life. They were curious about where things would lead down the road between Darron and I and they wanted me to be happy. I was hesitant, but went ahead and spent the holiday with his family.

On the way to Darron's parents house, a crazy deer came crashing into the car causing Darron and I to do a full 360 spin on the small highway. I was so terrified, that my stomach just tied up in knots. Darron's truck was banged up on the front side. Yet, during the spin, he was completely calm. He controlled this car so well during that moment that he prevented the two of us from flipping over the side to our deaths. I knew I had some questions about this man. After all, we had only been dating a month. But I could see that he wanted to be a good quality man before me. His sincerity in trying, caused me to loosen up my reigns and release a little bit of trust in him early on. At dinner, I met his mom, his dad, his sister, his niece, and their precious little dog. By all appearances, they were a sweet family. His sister was an overachieving RN that lived out of State, and his niece was very intelligent. His father was very kind. And his mother was blessed with the Midas touch when it came to cooking. That woman could cook anything and make it taste amazing."

**Exhibit 4**
**4 of 11**

This experience relating to being in an interracial relationship and meeting my past fiance's parents for the first time and also running into a deer was specific to my situation and my story. I do not believe that Jordan, nor the writers or producers involved in this film creation shared that exact same dynamic and circumstances as I did. Either way, it was displayed as a scene in his movie called "Get Out". And, my copyright was in tact 18 months prior to Jordan Peele obtaining his Copyright.

According to U.S. Copyright Law, I have exclusive rights to my story.  And although this infringement may have or may not have been done willfully, my copyrighted work was, and still is being  used without my permission which is a violation of those exclusive rights. The Defendants are all using this portion of my story and experience  in advertisements, in movie theaters, etc...and are continually engaging in copyright infringement.

**Access**

I did share my story online through social media to market my book. The social media avenues I used were dating as well as interracial dating group blog pages on facebook, twitter, and linkedin. I still have information about my book on linkedin.com for

Exhibit 4
5 of 11

business connections and for other networking opportunities. I am a member of

Createspace and had my book available for sale online through Createspaces site,

Amamzon,com, and AmazonEuropean between April 18, 2014-Feb 1, 2015. Each of

these sites had "Look Inside" Sections where random pages of the book would appear

for potential buyers viewing. This is factual proof that there was access to my written

work.

### Remedies

I am asking for literary writing credit from my book: "The Covering" because the

particular deer scene  played an important part in this horror film pertaining to

advertisements, etc....I am asking for 7 million dollars for the hardship experienced in

watching someone use this important portion of my story without my permission and

retrieve a large amount of funding where this section of my book was needed to improve

upon their film. I am also asking for current and future royalties in every aspect of the

films profits throughout the life of the film and it's sales ability. Here  is the breakdown

of my requests if the courts agree that this is appropriate. I am asking for a portion of the

funds due to the purchase of the script as it relates to the deer scene. The deer scene was

**Exhibit 4**
**6 of 11**

important and necessary in the horror film to create excitement, fear, and the element of surprise. The deer scene assisted in the film's transition to the Police scene where racial issues exemplified the police response. Another scene could have been used, but it was not.

I am asking for a percentage of any rewrites where the deer scene is included.

I am asking for a percentage of the Production bonus upon commencement of principal photography, etc...

I am asking for residuals (to receive credit on produced Guild covered material, and compensation if the material is reused) for a combination of DVD sales, TV airings, foreign, etc...

I am asking for a percentage if the movie gets made into a sequel, depending upon receiving my writing credit (shared or sole credit).

I ask that the studios pay a percentage to myself, based upon my writing fees, into a WGA pension program if possible where if achieved, 7 qualifying years, upon retirement I will receive a monthly payment based upon my total lifetime earnings.

**Exhibit 4**
**7 of 11**

Exhibit A

| | |
|---:|:---|
| **Type of Work:** | Dramatic Work and Music; or Choreography |
| **Registration Number / Date:** | PAu003809078 / 2015-11-02 |
| **Application Title:** | Get Out. |
| **Title:** | Get Out. |
| **Description:** | Electronic file (eService) |
| **Copyright Claimant:** | Sugarbear, LLC, Transfer: By written contract. Address: 7164 Melrose Ave. 2nd Floor, Los Angeles, CA, 90046. |
| **Date of Creation:** | 2015 |
| **Alternative Title on Application:** | Get Out of the House |
| **Authorship on Application:** | Jordan Peele, 1979- ; Citizenship: United States. Authorship: Screen Play. |
| **Names:** | Peele, Jordan, 1979- |
| | Sugarbear, LLC |

Exhibit 4
8 of 11

Exhibit B

| | |
|---:|:---|
| **Type of Work:** | Text |
| **Registration Number / Date:** | TXu001922667 / 2014-05-11 |
| **Application Title:** | The Covering. |
| **Title:** | The Covering. |
| **Description:** | Electronic file (eService) |
| **Copyright Claimant:** | Tia Patrice Griffin, 1967- . Address: 723 E Decatur Ave, Spokane, WA, United States. |
| **Date of Creation:** | 2014 |
| **Authorship on Application:** | Tiselle Bissette, pseud. of Tia Patrice Griffin, 1967- ; Domicile: United States; Citizenship: United States. Authorship: text. |
| **Rights and Permissions:** | Tia Griffin, CV, 723 E Decatur Ave, Spokane, WA, 99208, United States, (509) 607-8549, (509) 607-8549, insource_7@hotmail.com |
| **Names:** | Griffin, Tia Patrice, 1967- <br> Bissette, Tiselle, pseud., 1967- |

**Exhibit 4**
**9 of 11**

## CONCLUSION

Once again, I am asking that the courts approve my remedy requests. It wasn't just a simple experience where a deer hit a car on the highway. That happens all of the time. It also wasn't just an issue where a couple was driving to meet the others' parents which is a process that many couple's experience. The difference here and the comparison is that it is the exact same incident that occurred in my story that was repeated on the movie screen. The guest invited to the home was black and the invitee was his Caucasian girlfriend and her family. This was the exact same scenario in my book. It is not likely that the Defendants or their writers experienced the exact same issue of a deer slamming into their car during the exact same moments and events where an American black partner was traveling to meet his partner's Caucasian family *for the first time*. And furthermore, even if it was an unusual coincidence, I protected the exclusive rights to my specific story 18 months prior to Jordan Peele's copyright claim. I feel that my Copyright should maintain protection and I am asking for relief.

**Exhibit 4**
**10 of 11**

I attest that these statements are true without penalty or perjury.

Dated: 3/3/2017

Respectfully submitted,

Tia Griffin/Plaintiff (Pro Se)

Exhibit 4
11 of 11

Exhibit 5

Tia Griffin
Care of D. Griffin
2442 Iowa Avenue #P14
Riverside, CA. 92507



SUPERIOR COURT OF CALIFORNIA

FOR THE COUNTY OF RIVERSIDE


TIA GRIFFIN                    )      Civil Action No.  RIC1703920

    PLAINTIFF,

                              )

    vs.                       )      Re:   LITERARY COPYRIGHT

                                     INFRINGEMENT  AMENDED

                                     COMPLAINT

JORDAN PEELE,  NBC UNIVERSAL/PERFECT

WORLD PICTURES,

BLUMHOUSE  PRODUCTIONS

& QC ENTERTAINMENT)

    DEFENDANTS


**Exhibit 5**
**1 of 8**

1. I am the Claimant in this matter and have amended my complaint to correct the spelling  from Perfect Word Pictures to Perfect World Pictures.

2. In addition, I have added information on the company called QC Entertainment. This is a newly formed business that as of yet, doesn't have a definite address for the 4 businessmen who came together to create it. QC Entertainment consists of 4 persons including Sean Mckittrick, Edward H. Hamm, Jr., Shaun Redick, and and Ray Mansfield. Mckittrick and Hamm are said to be with Darko Entertainment. And, Redick and Mansfield are known to be employees of their own company called Movie Package Co. Therefore, I have had to serve two men at one location and the other two men at another business location.

3. I am also sharing my concerns about future goals in creating my own film from my book and how my attempts to add the Deer Scene within the interracial relationship and traveling towards my past Caucasian fiancé's house might forever be affected because of this film called "Get Out". My credibility will now be in question for something I created and had proper copy write protection prior to Peele and his Production Partners.

As Plaintiff,  I, TIA GRIFFIN, Author of the book "The Covering", request that the courts respond to my demand for recourse whereby my Literary Copyrighted Work from my book called "The Covering" TXu001922667 / 2014-05-11 , was infringed upon by the Defendants,  JORDAN PEELE,  NBC UNIVERSAL/PERFECT WORLD PICTURES, BLUMHOUSE  PRODUCTIONS & QC ENTERTAINMENT.   I will explain the infringement practices, access where my work was available Nationwide, in Europe, and advertised on social media. I will also provide factual examples of this infringement on the part of the Defendants to prove my accusations.

**Exhibit 5**
**2 of 8**

## Introduction

The infringement took place from Chapter 5 of my book on page 74. This Chapter was called "My Heartbreak". In this section, I spoke of my experience as an American black woman involved in a relationship with a white male at the time. In this section of the book, I explained our experience while driving out to Newport Washington from

Spokane to meet this man's parents for the first time. I stated and I quote from my book "One month into our relationship, Darron invited me and my teens to spend Thanksgiving with he and his family. My teens didn't want to go and really didn't seem to want me around. They wanted me to cook and get everything nice and wonderful for

the holiday. But, because they knew I had spent so many years alone, they encouraged me to go ahead and get to know this new man in my life. They were curious about where things would lead down the road between Darron and I and they wanted me to be happy. I was hesitant, but went ahead and spent the holiday with his family.

On the way to Darron's parents house, a crazy deer came crashing into the car causing Darron and I to do a full 360 spin on the small highway. I was so terrified, that my stomach just tied up in knots. Darron's truck was banged up on the front side. Yet, during the spin, he was completely calm. He controlled this car so well during that moment that he prevented the two of us from flipping over the side to our deaths. I knew I had some questions about this man. After all, we had only been dating a month. But I could see that he wanted to be a good quality man before me. His sincerity in trying, caused me to loosen up my reigns and release a little bit of trust in him early on. At dinner, I met his mom, his dad, his sister, his niece, and their precious little dog. By all appearances, they were a sweet family. His sister was an overachieving RN that lived out of State, and his niece was very intelligent. His father was very kind. And his mother was blessed with the Midas touch when it came to cooking. That woman could cook anything and make it taste amazing."

**Exhibit 5**
**3 of 8**

This experience relating to being in an interracial relationship and meeting my past fiance's parents for the first time and also running into a deer was specific to my situation and my story. I do not believe that Jordan, nor the writers or producers involved in this film creation shared that exact same dynamic and circumstances as I did. Either way, it was displayed as a scene in his movie called "Get Out". And, my   copyright was in tact 18 months prior to Jordan Peele obtaining his Copyright.

According to U.S. Copyright Law, I have exclusive rights to my story.  And although this infringement may have or may not have been done willfully, my copyrighted work was, and still is being  used without my permission which is a violation of those exclusive rights. The Defendants are all using this portion of my story and experience  in advertisements, in movie theaters, etc...and are continually engaging in copyright infringement.

### Access

I did share my story online through social media to market my book. The social media avenues I used were dating as well as interracial dating group blog pages on facebook, twitter, and linkedin. I still have information about my book on linkedin.com for business connections and for other networking opportunities. I am a member of Createspace and had my book available for sale online through Createspaces site, Amamzon,com, and AmazonEuropean between April 18, 2014-Feb 1, 2015. Each of these sites had "Look Inside" Sections where random pages of the book would appear for potential buyers viewing. I also shopped my book to numerous Publishing companies for their review in considering Publishing deals. This is factual proof that there was access to my written work.

**Exhibit 5**
**4 of 8**

## Remedies

I am asking for literary writing credit from my book: "The Covering" because the particular deer scene played an important part in this horror film pertaining to advertisements, etc....I am asking for 7 million dollars for the hardship experienced in watching someone use this important portion of my story without my permission and retrieve a large amount of funding where this section of my book was needed to improve upon their film. I am also asking for current and future royalties in every aspect of the films profits throughout the life of the film and it's sales ability. Here  is the breakdown of my requests if the courts agree that this is appropriate. I am asking for a portion of the funds due to the purchase of the script as it relates to the deer scene. The deer scene was important and necessary in the horror film to create excitement, fear, and the element of surprise. The deer scene assisted in the film's transition to the Police scene where racial issues exemplified the police response. Another scene could have been used, but it was not.

I am asking for a percentage of any rewrites where the deer scene is included.

I am asking for a percentage of the Production bonus upon commencement of principal photography, etc...

I am asking for residuals (to receive credit on produced Guild covered material, and compensation if the material is reused) for a combination of DVD sales, TV airings, foreign, etc...

I am asking for a percentage if the movie gets made into a sequel, depending upon receiving my writing credit (shared or sole credit).

I ask that the studios pay a percentage to myself, based upon my writing fees, into a WGA pension program if possible where if achieved, 7 qualifying years, upon retirement I will receive a monthly payment based upon my total lifetime earnings.

**Exhibit 5**
**5 of 8**

Exhibit A

**Type of Work:** Dramatic Work and Music; or Choreography

**Registration Number / Date:** PAu003809078 / 2015-11-02

**Application Title:** Get Out.

**Title:** Get Out.

**Description:** Electronic file (eService)

**Copyright Claimant:** Sugarbear, LLC, Transfer: By written contract. Address: 7164 Melrose Ave. 2nd Floor, Los Angeles, CA, 90046.

**Date of Creation:** 2015

**Alternative Title on Application:** Get Out of the House

**Authorship on Application:** Jordan Peele, 1979- ; Citizenship: United States. Authorship: Screen Play.

**Names:** Peele, Jordan, 1979-
Sugarbear, LLC

**Exhibit 5**
**6 of 8**

Exhibit  B

| | |
|---:|:---|
| **Type of Work:** | Text |
| **Registration Number / Date:** | TXu001922667 / 2014-05-11 |
| **Application Title:** | The Covering. |
| **Title:** | The Covering. |
| **Description:** | Electronic file (eService) |
| **Copyright Claimant:** | Tia Patrice Griffin, 1967- . Address: 723 E Decatur Ave, Spokane, WA, United States. |
| **Date of Creation:** | 2014 |
| **Authorship on Application:** | Tiselle Bissette, pseud. of Tia Patrice Griffin, 1967- ; Domicile: United States; Citizenship: United States. Authorship: text. |
| **Rights and Permissions:** | Tia Griffin, CV, 723 E Decatur Ave, Spokane, WA, 99208, United States, (509) 607-8549, (509) 607-8549, insource_7@hotmail.com |
| **Names:** | Griffin, Tia Patrice, 1967- |
| | Bissette, Tiselle, pseud., 1967- |

**Exhibit 5**

**7 of 8**

## CONCLUSION

Once again, I am asking that the courts approve my remedy requests. It wasn't just a simple experience where a deer hit a car on the highway. That happens all of the time. It also wasn't just an issue where a couple was driving to meet the others' parents which is a process that many couple's experience. The difference here and the comparison is that it is the exact same incident that occurred in my story that was repeated on the movie screen. The guest invited to the home was black and the invitee was his Caucasian girlfriend and her family. This was the exact same scenario in my book. It is not likely that the Defendants or their writers experienced the exact same issue of a deer slamming into their car during the exact same moments and events where an American black partner was traveling to meet his partner's Caucasian family *for the first time*. And furthermore, even if it was an unusual coincidence, I protected the exclusive rights to my specific story 18 months prior to Jordan Peele's copyright claim. I feel that my Copyright should maintain protection and I am asking for relief.

I attest that these statements are true without penalty or perjury.

Dated: 3/23/2017

Respectfully submitted,

Tia Griffin/Plaintiff (Pro Se)

**Exhibit 5**
**8 of 8**

Exhibit 6



# RIVERSIDE SUPERIOR COURT
### PUBLIC ACCESS

## Minute Order

| Case Name: GRIFFIN VS PEELE | |
| --- | --- |
| Riverside Civil | Intellectual Property-Over $25,000 (Riverside) |
| Case Number: RIC1703920 | File Date: 3/3/2017 |
| Action Date: 6/7/2017 | Action Time: 8:30 AM | Department: 03 |

**Action Description:** Hearing re: Demurrer to 1st Amended Complaint of GRIFFIN by JORDAN PEELE, NBCUNIVERSAL MEDIA LLC, BLUMHOUSE PRODUCTIONS, QC ENTERTAINMENT

Honorable Judge Irma Poole Asberry, Presiding

Clerk: J. Alvarez

Court Reporter: S. Mouzakis

TIA P GRIFFIN C/O D GRIFFIN present-Pro Per

JORDAN PEELE, PERFECT WORD PICTURES, BLUMHOUSE PRODUCTIONS, QC ENTERTAINMENT, NBCUNIVERSAL MEDIA LLC represented by DAVIS WRIGHT TREMAINE LLP - Eric Stahl present.

At 9:08, the following proceedings were held:

After issuance of tentative ruling arguments was requested.

Counsel Argue.

Court makes the following orders:

Court adopts the tentative ruling as the order of the Court.

Demurrer on 1st Amended Complaint of GRIFFIN as to JORDAN PEELE, BLUMHOUSE PRODUCTIONS, QC ENTERTAINMENT, NBCUNIVERSAL MEDIA LLC Sustained without leave to amend.

Sustained without leave to amend as this Court lacks jurisdiction.

CCP 430.10(a) permits a demurrer on the grounds that the court lacks subject matter

jurisdiction. Plaintiff's case is for copyright infringement. 28 USC 1338 states: "The district

courts shall have original jurisdiction of any civil action arising under any Act of Congress

relating to patents, plant variety protection, copyrights and trademarks. No State court shall

have jurisdiction over any claim for relief arising under any Act of Congress relating to

patents, plant variety protection, or copyrights." Thus, "

exclusive jurisdiction over copyright infringement causes of action." (Benitez v.

Williams (2013) 219 Cal.App.4th 270, 275.)

Stage at Disposition Before Trial - Court Ordered Dismissal - Other Court-ordered Dismissal (Civil Case Categories Only).

Entire action dismissed.

Hearing held: Pre-disposition hearing.

Minute entry completed.

**Exhibit 6**

Exhibit 7



# RIVERSIDE SUPERIOR COURT
### PUBLIC ACCESS

## Minute Order

| Case Name: GRIFFIN VS PEELE | |
|---|---|
| Riverside Civil | Intellectual Property-Over $25,000 (Riverside) |
| Case Number: RIC1703920 | File Date: 3/3/2017 |
| Action Date: 6/7/2017 | Action Time: 8:30 AM | Department: 03 |

**Action Description:** Hearing re: Motion to/for SPECIAL MOTION TO STRIKE PLAINTIFF'S FIRST AMENDED COMPLAINT by JORDAN PEELE, NBCUNIVERSAL MEDIA LLC, BLUMHOUSE PRODUCTIONS, QC ENTERTAINMENT

Honorable Judge Irma Poole Asberry, Presiding

Clerk: J. Alvarez

Court Reporter: S. Mouzakis

TIA P GRIFFIN C/O D GRIFFIN present-Pro Per

JORDAN PEELE, BLUMHOUSE PRODUCTIONS, QC ENTERTAINMENT, NBCUNIVERSAL MEDIA LLC represented by DAVIS WRIGHT TREMAINE LLP - Eric Stahl present.

At 9:08, the following proceedings were held:

After issuance of tentative ruling arguments was requested.

Counsel Argue.

Court makes the following orders:

Court orders the tentative ruling to be the order of the Court.

Motion for Special Motion to Strike is denied.

Although it would appear that ruling on this motion is moot in light of the sustaining of the

Demurrer as to the First Amended Complaint without leave to amend, the Special Motion to

Strike is denied as Defendant.s fail to meet the first prong of the analysis required under CCP

Section 426.16. Defendants correctly cite to Barry v. State Bar of California (2017) 2

Cal.5th 318, 320, 328-329, where the California Supreme Court held that the court has the power

to resolve an anti-SLAPP even though it lacks subject matter jurisdiction.

-

The first prong is whether or not plaintiff's claims in the present action arise out of

defendant's protected activity in furtherance of the right to petition or free speech. Defendant

has the burden on the first prong. The second prong is whether or not there is a probability

the plaintiff will prevail in the action, and is analyzed only if the first prong is met.

-

Defendant has not made the required prima facie showing that plaintiff's suit arises from any

act of defendant in furtherance of his right to petition or his right of free speech under the

**Exhibit 7**
**1 of 3**

| Case Name: GRIFFIN VS PEELE | |
|---|---|
| Riverside Civil | Intellectual Property-Over $25,000 (Riverside) |
| **Case Number:** RIC1703920 | **File Date:** 3/3/2017 |
| **Action Date:** 6/7/2017 | **Action Time:** 8:30 AM | **Department:** 03 |
| **Action Description:** Hearing re: Motion to/for SPECIAL MOTION TO STRIKE PLAINTIFF'S FIRST AMENDED COMPLAINT by JORDAN PEELE, NBCUNIVERSAL MEDIA LLC, BLUMHOUSE PRODUCTIONS, QC ENTERTAINMENT | |

federal or state constitution in connection with an issue of public interest. (CCP 425.16(e);

Equilon Enterprises v. Consumer Cause (2002) 29 Cal.4th 53, 67.) The act which forms the basis

for the plaintiff's cause of action must itself have been an act in furtherance of the right of

petition or free speech. (City of Cotati v. Cashman (2002) 29 Cal.4th 69, 76-78.)

The legislature has further defined an "act in furtherance of the person.' right

under the following 4 categories: 1. Any written or oral statement or writing made before a

legislative, executive, or judicial proceeding, or other authorized proceeding; 2. Any written

or oral statement or writing in connection with an issue under consideration in such a

proceeding; 3. Any written or oral statement made in a place open to the public or public

forum regarding an issue of public interest; or 4. Any other conduct in furtherance of the right

of petition or free speech in connection with a public issue or issue of public interest. (CCP

sec. 425.16(e).).

-

I have found no case law in either California or the Ninth Circuit where copyright infringement

was subject to anti-SLAPP. Instead, copyright infringement was an underlying basis for

malicious prosecution (see e.g., Mattel, Inc. v. Luce Forward Hamilton & Scripps (2002) 99

Cal.App.4th 1179) or defamation (see e.g., Traditional Cat Association v. Gilbreath (2004)

118 Cal.App.4th 392). The cases cited by Defendants happen to involve media where the

free speech was at issue; they do not stand for the proposition that media involvement is

sufficient to meet the first prong.

At the heart of Plaintiff's complaint is a copyright infringement case, which is defined

as: "ownership of the copyright and actual copying by the defendant." (Spinner v. American

Broadcasting Companies, Inc. (2013) 215 Cal.App.4th 172, 186.) This does not involves

the creative process at all.

-

**Exhibit 7**
**2 of 3**

**Case Name:** GRIFFIN VS PEELE

| Riverside Civil | Intellectual Property-Over $25,000 (Riverside) |
|---|---|
| **Case Number:** RIC1703920 | **File Date:** 3/3/2017 |

| **Action Date:** 6/7/2017 | **Action Time:** 8:30 AM | **Department:** 03 |
|---|---|---|

**Action Description:** Hearing re: Motion to/for SPECIAL MOTION TO STRIKE PLAINTIFF'S FIRST AMENDED COMPLAINT by JORDAN PEELE, NBCUNIVERSAL MEDIA LLC, BLUMHOUSE PRODUCTIONS, QC ENTERTAINMENT

A prevailing plaintiff is entitled to attorney fees and costs if the special motion to strike

is "frivolous or is solely intended to cause unnecessary delay." (CCP 425.16(c).) As

plaintiff is pro per, she has no attorney fees demonstrated. Nor has she shown the motion is

frivolous. No fees are awarded.

Hearing held: Pre-disposition hearing.

Minute entry completed.

**Exhibit 7**
**3 of 3**

Exhibit 8

JS-6

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CHRISTOPHER "CHRIS" WAYNE FILLMORE, an individual,<br><br>            Plaintiff,<br><br>vs.<br><br>BLUMHOUSE PRODUCTIONS, LLC, and JEREMY SLATER,<br><br>            Defendant. | Case No.  2:16-cv-04348-AB-SS<br><br>**ORDER GRANTING MOTION TO DISMISS** |

     Before the Court is Defendants Blumhouse Productions, LLC and Jeremy Slater's (collectively "Defendants") Motion to Dismiss Plaintiff's First Amended Complaint and Request for Judicial Notice in Support of Motion to Dismiss. ("Motion" and "RJN," Dkt. Nos. 51 and 51-1).  Plaintiff filed an opposition and Defendants filed a reply.  (Dkt. Nos. 56, 63.)  Upon consideration of the parties' arguments and the case file, the Court hereby **GRANTS** the Motion.

## I.    BACKGROUND

     Plaintiff's First Amended Complaint ("FAC," Dkt. No. 43) alleges as follows. Between 2004 and 2005, Plaintiff wrote an original manuscript entitled "Laza[u]ri Taza" ("Manuscript").  FAC ¶ 22.  In 2006, Plaintiff registered his Manuscript with the United States Copyright Office; Plaintiff did not release his Manuscript to the

**Exhibit 8**

public before it was registered.  *Id.* ¶ 23.  From 2006 to 2013, Plaintiff allegedly submitted either portions of the manuscript or its entirety to various talent agents, literary agents, management companies and publishers throughout the United States, and made it commercially available through the "print on demand" publisher "lulu.com."  *Id.* ¶ 25.  Plaintiff also contends that he distributed either electronic or hard copies of his manuscript to pay-for-critique services, family, friends, associates, and one editor for hire.  *Id.*

Plaintiff learned of Defendants' film "The Lazarus Effect" ("Film") in February 2015 via the Film's advertisements.  *Id.* ¶ 26.  On February 27, 2015, Plaintiff attended a pre-release screening of the Film and became suspicious that it was substantially similar to his Manuscript  *Id.* ¶ 27.  Plaintiff alleges that after thoroughly comparing the two works and recognizing similarities between the two, he gave written notice to Defendants in December 2015 and January 2016, which purportedly addressed his suspicions and asserted that the similarities between the two works constitutes infringement of Plaintiff's copyright  *Id.* ¶¶ 28-30.  Defendants refuted Plaintiff's accusations, and Plaintiff filed this action.  *Id.* ¶ 31.

Plaintiff asserts that numerous and significant similarities between his Manuscript and Defendants' Film demonstrate that Defendants copied his Manuscript in violation of the Copyright Act, 17 U.S.C. § 101 *et seq.* and 28 U.S.C. § 1338.  *Id.* ¶¶ 1, 33.  Additionally, Plaintiff contends that Defendants infringed his copyright willfully, intentionally, purposefully, and in disregard of and with indifference to said copyright.  *Id.* ¶ 34.  Accordingly, Plaintiff argues that he is entitled to statutory damages, or, in the alternative, an award to be proven at trial.  *Id.* ¶¶ 35, 38.  Plaintiff also claims that he is entitled to the profits Defendants obtained from the infringement in accordance with 17 U.S.C. § 504(b).  *Id.* ¶ 36.  Lastly, Plaintiff asserts that he has and will continue to suffer substantial and irreparable injury for which there is no adequate remedy at law.  *Id.* ¶¶ 37-38.  For that reason, Plaintiff requests permanent injunctive relief to enjoin and restrain Defendants from continuing to infringe upon his

2.

Exhibit 8

1   copyright. *Id.* ¶¶ 37-38.

2        Defendants move for dismissal on the grounds that Plaintiff cannot plead or

3   prove copying because (1) Plaintiff is unable to prove Defendants had access to

4   Plaintiff's unpublished manuscript , (2) the Manuscript is not substantially similar to

5   Defendants' feature film "The Lazarus Effect," and (3) Plaintiff is therefore unable to

6   plead a claim for copyright infringement. Concurrently, Defendants request judicial

7   notice of the contents of the Manuscript and Film at issue as well as generic literary

8   and cultural elements commonly employed in literature.

9   **II.    LEGAL STANDARD**

10        Federal Rule of Civil Procedure 8(a)(2) requires a plaintiff to provide a "short

11   and plain statement of the claim showing that the pleader is entitled to relief."

12   Although a plaintiff need not provide detailed factual allegations in the complaint, "a

13   plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires

14   more than labels and conclusions, and a formulaic recitation of the elements of a cause

15   of action will not do." *Ashcroft v. Iqbal*, 556 U.S. 662, 555 (2009) (alteration in

16   original).  To survive a Rule 12(b)(6) motion to dismiss, a plaintiff's claim must be

17   more than a suspicion; the "[f]actual allegations must be enough to raise a right to

18   relief above the speculative level." *Id.*

19        In deciding a Rule 12(b)(6) motion, "[a]ll allegations of material fact are taken

20   as true and construed in the light most favorable to the nonmoving party." *Sprewell v.*

21   *Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001) (citing *Enesco Corp. v.*

22   *Price/Costco, Inc.*, 146 F.3d 1083, 1085 (9th Cir. 1998).  Accordingly, for a defendant

23   to be successful in a Rule 12(b)(6) motion, there must either be (1) a "lack of a

24   cognizable legal theory," or (2) "the absence of sufficient facts alleged under a

25   cognizable legal theory." *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th

26   Cir. 1990).

27        The Court may "consider materials—documents attached to the complaint,

28   documents incorporated by reference in the complaint, or matters of judicial notice—

**Exhibit 8**

without converting the motion to dismiss into a motion for summary judgment."[1] *United States v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003). Importantly, the Court can consider materials that are not "physically" attached to the complaint at issue but "whose contents are alleged in [the] complaint and whose authenticity no party questions." *Branch v. Tunnell*, 14 F.3d 449, 454 (9th Cir. 1994).

Courts in the Ninth Circuit have applied this legal standard to resolve motions to dismiss copyright claims, allowing defendants to introduce the copyrighted work and the infringing work that were not included but referenced in the complaint. *See Silas v. Home Box Office, Inc.*, 201 F. Supp. 3d 1158, 1168 (C.D. Cal. 2016) (taking judicial notice of a motion picture trailer, a shortened trailer, a screenplay, a treatment and the *Ballers* television series that were all referenced in the plaintiff's complaint but not attached). Courts "may [also] take judicial notice of generic elements of creative works" and elements common to a genre. *Zella v. E.W. Scripps Co.*, 529 F. Supp. 2d 1124, 1129 (C.D. Cal. 2007). Additionally, the Court may compare and examine the two works in question and determine "non-infringement" on a Motion to Dismiss. *Puckett v. Hernandez*, 2016 WL 7647555 at *18 (C.D. Cal. 2016) (holding that a comparison of the lyrics of the two works at issue is appropriate on a 12(b)(6) motion to dismiss the copyright claim); *Gadh v. Spiegel*, 2014 WL 1778950 at *7 (C.D. Cal. 2014) ("For fifty years, courts have followed this rather obvious principle and dismissed copyright claims that fail from the face of the complaint.") (citing *Christianson v. West Pub. Co.*, 149 F.2d 202, 203 (9th Cir. 1945) ("[W]hen the copyrighted work and the alleged infringement are both before the court, capable of examination and comparison, non-infringement can be determined on a motion to dismiss.")).

---

[1] Plaintiff argues that under Fed R. Civ. Proc. 12(d), the Court cannot consider the two works or Defendants' other requests for judicial notice without converting Defendants' motion into one for summary judgment. However, this is contrary to long-standing black-letter law as stated in *Branch v. Tunnell*, 14 F.3d 449 (9th Cir. 1994) and *United States v. Ritchie*, 342 F.3d 903 (9th Cir. 2003).

4.

**Exhibit 8**

## III.    DEFENDANTS' REQUEST FOR JUDICIAL NOTICE

In support of their motion, Defendants seek judicial notice of the two works, of certain facts not subject to reasonable dispute, and of a number of generic literary elements, pursuant to Fed. R. Evid. ("Rule") 201.

For the following reasons, the Court **GRANTS** the Defendants' requests for judicial notice.

### A. The Court Takes Judicial Notice of the Manuscript and the Film.

Defendants submitted Plaintiff's Manuscript and a DVD of the Film for the Court's review.  *See* RJN 1:5-1; Stahl Decl. (Dkt. No. 51-2) ¶¶ 2, 4, Exhs. 1 and 2. Although neither work is attached to the FAC, the FAC refers to them extensively so they may be considered in deciding this motion.  Furthermore, there is no dispute that the Manuscript and the DVD Defendants submitted are true and correct copies.  These materials are therefore judicially noticeable under Rule 201.  The Court briefly summarizes  Plaintiff's Manuscript and Defendants' Film.

#### 1.  **Plaintiff's Manuscript**

Plaintiff's Manuscript  is a murder mystery about two detectives who try to solve a case involving a serial killer who is targeting reanimated corpses, or "Necrosapiens." The story depicts how scientific advances and the widespread practice of reanimation has affected society at large. Throughout the Manuscript, the detectives work to find the person responsible for the killings. The story ends with the discovery of the serial killer's identity.

#### 2.  **Defendants' Film**

The Defendants' Film is a science-fiction horror movie about a group of university medical researchers who have designed a serum that allows doctors to save more lives by stopping neural degeneration in coma patients and lengthening the temporal opportunity to revive patients in cardiac arrest. They discover that their serum has the power to bring animals back to life. After one of the researchers, Zoe, is fatally electrocuted in the course of an experiment, the research team uses the serum

5.

**Exhibit 8**

to bring her back to life. Once reanimated, Zoe begins to have supernatural powers such as the ability to read minds and move objects or people with great force. After being trapped in hell during the short period between her death and reanimation, Zoe decides to kill the researchers responsible for her reanimation.

### B. The Court Takes Judicial Notice of Facts Not Subject to Reasonable Dispute and to Certain Generic Literary Elements.

Defendants request judicial notice of facts not subject to reasonable dispute and to certain generic literary elements. *See* RJN 1:10-24. These items are:

*Facts Not Subject to Reasonable Dispute:*

1. Lazarus is a biblical figure who, according to the New Testament, was raised from the dead by Jesus.

2. The term "The Lazarus Phenomenon" has been used in medical literature to describe an occurrence in which clinically dead humans demonstrate spontaneous signs of life.

3. The name Lazarus has been used in numerous expressive works regarding death and resurrection.

*Generic Literary Elements*:

1. The possibility of resurrection is a common element in religious works.

2. Bringing the dead back to life is a common element in horror, fantasy and science fiction books and movies.

3. Dream sequences are a common narrative device in works of fiction.

Because the determination of copyright infringement requires an examination of the actual works themselves and a finding of substantial similarity between Plaintiff's protected expression and Defendants' Film, the Court may take judicial notice of the two works as well as generic literary elements and undisputable facts related thereto. *Zella*, 529 F. Supp. 2d at 1129. The Court has considered the proffered facts and

6.

**Exhibit 8**

literary elements and finds that they are not subject to reasonable dispute because they are generally known within the court's jurisdiction. *See* Fed. R. Civ. P. 201(b)((1). The Court therefore takes judicial notice of the listed facts and literary elements.

## IV. DISCUSSION

### A. Pleading Copyright Infringement

To succeed in a copyright infringement claim, Plaintiff must show (1) he has ownership of a valid copyright, and (2) Defendants copied protected elements of the Manuscript that are original. *Funky Films, Inc. v. Time Warner Entm't Co.*, 462 F.3d 1072, 1076 (9th Cir. 2006) (quoting *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361 (1991)). Defendants do not dispute the first element: that Plaintiff owns a valid copyright in his Manuscript. They argue only the second element: that Plaintiff cannot show that Defendants copied his Manuscript.

Unless Plaintiff presents direct evidence of copying, he must prove that Defendants had "access" to his Manuscript and that his Manuscript and Defendants' Film are substantially "similar." *Three Boys Music Corp. v. Bolton*, 212 F.3d 477, 485 (9th Cir. 2000); *see also Bernal v. Paradigm Talent & Literary Agency*, 788 F. Supp. 2d 1043, 1052 (C.D. Cal. 2010); *Funky Films*, 462 F.3d at 1072.

"In what is known as the 'inverse ratio rule,' [courts] 'require a lower standard of proof of substantial similarity when a high degree of access is shown.'" *Three Boys*, 212 F.3d at 485 (citing *Smith,* 84 F.3d at 1218 ). And, if the plaintiff cannot establish access, he can still establish copying by showing that the works are "*strikingly* similar." *Id.* (emphasis added).

Importantly, a high degree of access cannot eliminate the plaintiff's burden of proving similarities between her work and the defendant's work. As Plaintiff points out, in deciding a motion to dismiss, the Court is not required to make an in-depth evaluation of the facts in the case file or Defendants' access to Plaintiff's Manuscript. Rather, the Court must analyze the purported substantial similarity between Plaintiff's Manuscript and Defendants' Film. "No amount of proof of access will suffice to

7.

**Exhibit 8**

1    show copying if there are no similarities." *Sid & Marty Kroft Television Prods., Inc.*

2    *v. McDonald's Corp.*, 562 F.2d 1157, 1172 (9th Cir. 1977).  If Plaintiff is unable to

3    allege facts sufficient to establish substantial similarity between Plaintiff's Manuscript

4    and Defendants' Film, Defendants' Motion to Dismiss may be granted.

5         Here, Plaintiff does not claim that he has direct evidence that Defendants copied

6    his Manuscript.  Rather, he alleges that Defendants had the opportunity to access his

7    Manuscript and that the Manuscript and the Film are substantially similar.

8         **B. The Complaint Pleads Facts that Would Show that Defendants Had,** *At*

9              *Most,* **a Slight Possibility of Access to the Manuscript.**

10        Proof of access requires proof of "an opportunity to view or to copy plaintiff's

11   work."  *Sid & Marty Kroft Television Prods., Inc. v. McDonald's Corp.*, 562 F.2d

12   1157, 1172 (9th Cir. 1977).  The Ninth Circuit has often determined "opportunity to

13   view" in light of a defendant's reasonable potential to view a plaintiff's work.  *Three*

14   *Boys*, 212 F.3d at 482 (quoting *Jason v. Fonda*, 526 F. Supp. 774 (C.D. Cal. 1981),

15   *aff'd*, 698 F.2d 966 (9th Cir. 1983)).  Access cannot be inferred from Plaintiff's "mere

16   speculation or conjecture."  *Three Boys*, 212 F.3d at 482 (quoting 4 Nimmer, *Nimmer*

17   *on Copyright* § 13.02[A], at 13-19 (2003)).  Instead, Plaintiff must show a "reasonable

18   possibility of viewing [his] work-not a bare possibility."  *Id.*  Although the Court may

19   consider circumstantial evidence of access, it is typically proven by either (1) a chain

20   of events that link the plaintiff's work and defendant's access, or (2) proof that the

21   "plaintiff's work has been widely disseminated."  *Three Boys*, 212 F.3d at 482.

22        Plaintiff does not allege facts that would directly establish that Defendants

23   accessed Plaintiff's Manuscript, nor does Plaintiff  allege that there is a chain of

24   events that demonstrate Defendants' access to Plaintiff's Manuscript. Namely,

25   Plaintiff does *not* allege that Plaintiff sent Defendants his Manuscript, Defendants

26   purchased Plaintiff's Manuscript, or that another individual or group of individuals

27   who possessed the Manuscript gave it to Defendants.  Instead, Plaintiff asserts that

28   because Plaintiff's Manuscript was highly accessible and thus widely disseminated, an

**Exhibit 8**

1   inference of access can be made. Plaintiff points to the fact that his Manuscript (1)
2   was sent to various talent agents, literary agents, management companies, publishers,
3   friends, and family throughout the U.S., and (2) was commercially available from
4   2006-2013 on "lulu.com," to contend that the Manuscript can be considered widely
5   disseminated.  FAC ¶¶ 24, 25.

6       The Ninth Circuit has previously stated that "although [they] recognize the
7   power of the internet to reach a wide and diverse audience, [internet presence is not
8   necessarily] sufficient to demonstrate wide dissemination."  *Art Attacks Ink, LLC v.*
9   *MGA Enter. Inc.*, 581 F.3d 1138, 1145 (9th Cir. 2009).  "In most cases, the evidence
10  of widespread dissemination centers on the degree of a work's commercial success
11  and on its distribution through radio, television, and other relevant mediums."  *Loomis*
12  *v. Cornish*, 836 F.3d 991 (9th Cir. 2016); *see also Rice v. Fox Broad. Co.*, 330 F.3d
13  1170, 1178 (9th Cir. 2003).  For example, the Ninth Circuit has held that a video that
14  sold 17,000 copies and a book that sold approximately 2,000 copies could not be
15  considered widely disseminated.  *See Rice*, 330 F.3d at 1178 ("*The Mystery Magician*
16  only sold approximately 17,000 copies between 1986 and 1999; therefore, the video
17  cannot be considered widely disseminated,..");and *Jason v. Fonda*, 526 F. Supp. 774,
18  776 (C.D. Cal. 1981) (no more than "bare possibility" that defendants had access to a
19  book that sold about 2,000 copies).  The FAC presents no factual allegations that
20  Plaintiff's Manuscript was distributed or sold in a volume that exceeds that of the
21  aforementioned works.  To the contrary, Plaintiff does not allege any sales at all.
22  Rather, he alleges only that he personally sent the manuscript to talent agents, literary
23  agents, friends and family, and the like.  It is not plausible that Plaintiff's
24  uncompensated distribution reached into the thousands of copies, let alone more than
25  17,000 copies, so he has not pled facts that could establish widespread dissemination
26  sufficient to support an inference of access.

27      The Court has found one case with facts somewhat analogous to those of the
28  current action. In *Mestre v. Vivendi Universal U.S. Holding Co.,* 2005 WL 1959295

**Exhibit 8**

(D. Or. Aug. 15, 2005), *aff'd*, 273 F. App'x 631 (9th Cir. 2008), Plaintiff alleged that distributing his screenplay to approximately 211 individuals who were described as "extremely well-connected in the film industry" constituted wide dissemination. *Mestre,* 2005 WL 1959295 *3. However, the court found that even "with all inferences drawn in light most favorable to plaintiffs, plaintiffs fail[ed] to establish a reasonable inference of wide dissemination." *Id.* Importantly, the plaintiff's screenplay had "gained no commercial success or notoriety." *Id.* Likewise, Plaintiff's allegations that he sent copies to agents, friends, and family cannot plausibly establish that the Manuscript was disseminated widely. Therefore, there is no more than a bare possibility that Defendants had access to the Manuscript.

### C. The Works Are Not Substantially Similar.

As noted above, depending on the degree of access a plaintiff proves, he can establish copying by showing that the works are either *substantially* similar, or *strikingly* similar. Plaintiff cannot establish a high probability of access, so he must satisfy the more demanding strikingly similar standard. However, even if the less demanding substantially similar standard applies, Plaintiff cannot satisfy it.

The substantial similarity test consists of an intrinsic component and an extrinsic component. *Funky Films*, 462 F.3d at 1077. The intrinsic component evaluates "an ordinary person's subjective impressions of the similarities between two works" and therefore is a matter of fact for the jury. *Id.* The extrinsic component, which determines whether or not substantial similarity between the works exists as a matter of law, is therefore a question for the court. *Id.* Both components are required to establish substantial similarity. *See Kouf v. Walt Disney Pictures & TV*, 16 F.3d 1042, 1045 (9th Cir. 1994). Therefore, if a plaintiff is unable to satisfy the extrinsic component of the substantial similarity test, then the plaintiff is unable to show substantial similarity as a matter of law. *Id.*

For literary works, the extrinsic component requires a court to objectively evaluate whether there are "articulable similarities between the plot, themes, dialogue,

10.

**Exhibit 8**

mood, setting, pace, characters, and sequence of events." *Zella*, 529 F. Supp. 2d at 1133 (quoting *Funky Films*, 462 F.3d at 1077). In analyzing the similarities between the two works, the Court must only consider *protectable* elements of expression. *Cavalier v. Random House*, 297 F.3d 815, 822 (9th Cir. 2002). Basic plot ideas or "situations and incidents that flow necessarily or naturally from a basic plot premise, cannot sustain a finding of infringement." *Id.* at 22. Moreover, "[s]imilarities from the use of common ideas cannot be protected." *Apple Computer, Inc. v. Microsoft Corp.*, 35 F.3d 1435, 1443 (9th Cir. 1994). Rather than a general idea, an author's unique manifestation of an idea is to be considered protectable expression. "[P]rotectable expression includes the specific details of an author's rendering of ideas." *Metcalf v. Bochco*, 294 F.3d 1069, 1074 (9th Cir. 2002).

The Court has reviewed the two works and the parties' positions, and finds as follows concerning the extrinsic component of the substantial similarity test.

### 1. Setting, Plot and Sequence of Events

The setting, plot, and sequence of events within the two works are not similar.

Where the setting of Plaintiff's Manuscript is the fictional city of New Athens, in the year 2096, Defendants' Film is a horror movie set in Berkeley, California, in the present day.

Plot is defined as "'the sequence of events by which the author expresses his theme or idea.'" *Zella*, 529 F. Supp. 2d at 1133 (quoting 4 Nimmer, *Nimmer on Copyright* § 13.03[A][1][b], at 13-42 (2003)). Because "[g]eneral plot ideas are not protected by copyright law," the Court must instead consider the "actual concrete elements that make up the total sequence of events." *Berkic v. Crichton*, 761 F.2d 1289, 1293 (9th Cir. 1985). The Ninth Circuit is "'particularly cautious [of finding substantial similarity] where [a] list [of perceived similarities] emphasizes random similarities scattered throughout the works.'" *Shame on You Prods. v. Banks*, 120 F. Supp. 3d 1123, 1151 (C.D. Cal. 2015) (quoting *Litchfield v. Spielberg*, 736 F. 2d 1352, 1356 (9th Cir. 1984)).

**Exhibit 8**

Plaintiff's Manuscript, a murder-mystery, depicts two detectives who work to solve a string of murder cases. The scientific process of human reanimation is widespread and as a result, newly reanimated humans, "Necrospaiens," are the subject of hate crimes and discrimination. A serial killer is murdering newly reanimated "Necrosapiens" at random. The majority of Plaintiff's Manuscript takes the reader through the two detectives' crime solving process where they follow leads and ultimately discover where the killer will strike next. Plaintiff's Manuscript ends with an injured Detective Ellion, the death of the final victim, and the death of the killer himself. The detectives discover that the killer is a Necrosapien, but his motive for killing his fellow Necrosapiens is left a mystery.

In Defendants' Film, Researchers at a university laboratory have been looking to find new methods of "arresting neural decay in coma patients." Film, Ex. 2, at 25:23. After one of the researchers, Zoe, is fatally electrocuted in the course of an experiment, the rest of the researchers attempt to revive her using the "Lazarus" serum that was previously successful in animal regeneration. In contrast to Plaintiff's Manuscript, the world that Defendants' Film depicts is one in which reanimation is uncommon, if not unprecedented. Because of the unknown consequences, the characters are hesitant to bring their fellow researcher back to life, but ultimately go through with the procedure. The "Lazarus" serum gives Zoe the supernatural powers to read minds, levitate, and move objects. Stuck in what appears to be some sort of Hell/Limbo, Zoe becomes possessed with an evil plan to kill her colleagues. The Film ends when Zoe kills her last colleague and then attempts to reanimate her husband, fellow researcher Frank.

Despite the foregoing, Plaintiff argues that (1) the technology used to reanimate the deceased in Defendants' Film is substantially similar to the technology used in Plaintiff's Manuscript, and (2) research in both stories was initially conducted on lab animals before being executed on humans. These cited similarities flow naturally from plots involving innovative research experiments and unprecedented human

**Exhibit 8**

1   reanimation. Therefore, such similarities are not protectable and cannot be a basis for

2   establishing copyright infringement. *See Metcalf*, 294 F.3d at 1074 (9th Cir. 2002)

3   (holding copyright law does not protect scenes that flow naturally from unprotectable

4   plot premises).

5       Additionally, Plaintiff points to the scene in Defendants' Film where the

6   researchers' benefactors terminate their project and repossess the fruits of their labor.

7   Plaintiff claims that this is substantially similar to the point in Plaintiff's Manuscript

8   where the FBI repossesses the principal characters' investigation. While in

9   Defendants' Film the researchers' benefactors terminate the research project because

10  they want to capitalize on the researchers' intellectual gain, the detectives in

11  Plaintiff's Manuscript take over the serial-killer case in accordance with standard

12  protocol. Thus, the motives behind the researchers' benefactors are dissimilar to the

13  motives behind the detectives, and do not advance the plot in similar, protectable

14  ways.

15      Plaintiff also alleges that the plot twist at the end of Defendants' Film, where

16  Zoe attempts to reanimate Frank, "holds the same measure of ambiguity surrounding

17  the killer" as Plaintiff's Manuscript does when it promptly ends without identifying

18  the killer's motive. Opp'n 8:17-18. However, both works end in a way that is

19  attributable to their genre. Like many horror films, Defendants' Film ends with a

20  horrific open-ended possibility: namely, the audience is left to hypothesize whether

21  Zoe will be successful in her attempts to reanimate Frank, who then may become an

22  accomplice in her evil acts. In contrast, Plaintiff ends his Manuscript with a mystery

23  that remains unsolved: the serial killer's motive. Although the reader discovers the

24  serial killer's identity, they are left to question his motive in typical mystery-genre

25  fashion. The mere fact that both works end with "the same measure of ambiguity" is

26  not sufficient to satisfy the substantial similarity test. Instead, Plaintiff would have to

27  look to a lower level of generality, and allege that the ambiguous endings of the two

28  works are similar in *protectable* ways, such that Plaintiff's manifestation of "mystery

13.

**Exhibit 8**

endings" was infringed on. For these reasons, the purported similarities between the works cannot be considered substantially similar for the purposes of establishing a copyright claim.

Lastly, Plaintiff contends that the moment in Defendants' Film where Frank sacrifices himself to Zoe is similar to the unintentional self-sacrifice of the female principal Detective Ellion in Plaintiff's Manuscript. Yet, while Zoe killed Frank during his attempt to fatally inject her with poison and put an end to her disastrous reanimation, Detective Ellion in Plaintiff's Manuscript was injured in the line of duty. Thus, even if there were two similar elements of "sacrifice" in the two plots, both manifestations of the general theme of sacrifice are unique and therefore not similar in protectable ways.

Plaintiff looks to a high level of generality for similarities between his Manuscript and Defendants' Film. The Court finds that the plot and sequence of events of the two works in question both follow the traditional plots of their respective genres, and are not unique manifestations of general literary elements. As noted, such similarities are not within the confines of protectable expression, and therefore do not establish extrinsic similarity between the two works.

## 2. **Theme**

"[F]amiliar scenes and themes are among the very staples of modern American literature and film." *Berkic*, F.2d at 1294. As such, they are not protectable expression and therefore do not give rise to a copyright infringement claim. *Id.* "It merely reminds us that in Hollywood…there is only rarely anything new under the sun." *Id.* If works present similar themes but do so in two distinct ways, the themes are not considered substantially similar under the substantial-similarity test. *Funky Films*, 462 F.3d at 1077.

Plaintiff concedes that the concept of "resurrection" is common among a number of literary works. Yet, Plaintiff argues that there are several similarities between the themes of the two works.

14.

**Exhibit 8**

First, Plaintiff believes that the fact that the Defendants also use the term "Lazarus" in their Film establishes similarity between the two works. However, as Defendants point out, and as this Court took judicial notice of, Lazarus is a well-known biblical figure who was raised from the dead and brought back to life. *See* RJN 1:10-24. Similarly, the name "Lazarus" has long been widely used to symbolize reanimation or signs of reanimation in the medical, religious, literary, and cinematic world. "Lazarus" is not a protectable term and the ideas that flow "necessarily from" the term "Lazarus" are not protectable expression. The theme of scientific reanimation has been used numerous times in past literary works- Mary Shelley's *Frankenstein* to name one. That Plaintiff and Defendants both used this familiar theme in their works does not establish that any protectable elements are similar.

Second, Plaintiff asserts that (1) the theme of "what happens beyond death?" becomes a great motivation for the characters in both works, (2) the reanimated characters in both works experience a heaven/hell scenario, (3) the characters in both works consider what societal/religious implications reanimation brings, and (4) the first animals to be successfully reanimated suffered adverse reactions from the procedure. These themes can be said to "necessarily flow" from the term "Lazarus" and the connotations that accompany it, and have also been present in various past literary works. Therefore, these themes are not a basis for establishing extrinsic similarity.

Plaintiff lastly contends that the two works share the theme of (1) dreams surrounding and/or associated with a character's job, and (2) a man's motive to use reanimation to resurrect his wife. But, as the Defendants point out, and as the Court took notice of, a great number of past literary works across genres contain themes involving dreams. Additionally, there are a number of past literary works that involve a character who wants to preserve his wife's life. Because said themes in Plaintiff's Manuscript and Defendants' Film had different substance, motivation, and literary purpose, these common themes cannot establish extrinsic similarity in this instance.

15.

**Exhibit 8**

### 3. **Mood**

As noted, Plaintiff's Manuscript is a murder-mystery involving two detectives who pursue a serial killer. The mood of Plaintiff's Manuscript reflects its genre: it is suspenseful and serious, and builds as the detectives get closer to solving their case and identifying the killer. Defendants' Film is a horror film and its mood also reflects its genre: the mood quickly builds and remains suspenseful and horrific as Zoe murders her colleagues in gruesome and intentionally startling ways. Although both works aim to create a suspenseful mood for their respective audiences, general suspense is not protectable expression and cannot establish the extrinsic similarity necessary to support a copyright infringement claim.

### 4. **Dialogue**

Defendants have alleged that there are no similarities between the dialogue present in Plaintiff's Manuscript and that of Defendants' Film. Plaintiff leaves this uncontested. The Court has examined the dialogues and does not find that there are similarities between the dialogue in Plaintiff's Manuscript and the dialogue in Defendants' Film.

### 5. **Pace**

Defendants argue that the pace or timeline of the two works are dissimilar. While Plaintiff's Manuscript develops along approximately months of an investigation and often references back to events sixteen years in the past, Defendants' Film unfolds in a matter of two days. With the exception of Zoe's dream that recounts a traumatic moment in her childhood, Defendants' Film does not reference past events. Plaintiff also leaves this uncontested. The Court finds that the pace of the two works are dissimilar.

### 6. **Characters**

Characters may be protectable expression if they have "distinctive character traits and attributes" that are "sufficiently delineated." *DC Comics v. Towle*, 802 F.3d 1012, 1021 (9th Cir. 2015). When assessing whether or not two characters are

16.

**Exhibit 8**

protectable and substantially similar, "courts require a very high degree of similarity between characters." *Silas*, 201 F. Supp. 3d at 1177. Defendants argue that there are no protectable similarities between any character in Plaintiff's Manuscript and any character in Defendants' Film. Plaintiff, on the other hand, asserts that there are significant similarities between the characters in the two works.

The Court will take judicial notice of the following literary element at Defendants' request: a character disobeying a superior's orders is a common narrative device in works of fiction.

### i. Antagonist

Plaintiff claims that the antagonist in both Plaintiff's Manuscript and Defendants' Film (1) engage in an indiscriminate killing spree and (2) are both adversely affected by reanimation. Such elements of a character are not distinctive enough to be properly considered protectable expression.

### ii. Main Characters

Plaintiff asserts that there are numerous similarities between the principal and secondary characters of the two works. The Court finds that the alleged similarities between characters are not protectable, and therefore do not satisfy the substantial similarity analysis. The Court addresses the alleged similarities between the two main characters to illustrate its reasoning.

Plaintiff contends that the main male character in Defendants' Film, Frank, is a combination of male principal Detective Dobbs and two secondary characters in Plaintiff's Manuscript. Plaintiff does not provide specific examples to demonstrate his claim.

Frank is a tenacious researcher who explicitly breaks the rules to continue his research. After his wife Zoe dies in the course of a forbidden experiment, Frank uses the "Lazarus serum" in a desperate attempt to bring her back to life. Dobbs, in contrast, is characterized as a rugged detective who "never broke [the rules]," but instead reinvents them in the pursuit of justice. Manuscript, p. 8. The Court finds no

17.

**Exhibit 8**

1  meaningful similarities between the two male principals that would satisfy the
2  substantial similarity analysis.

3       Plaintiff also contends that the female main character in Defendants' Film, Zoe,
4  is an amalgamation of female principal Detective Ellion (in light of her working
5  relationship with Detective Dobbs) and other minor characters (who may have been
6  reanimated). Again, Plaintiff does not provide specific examples to demonstrate his
7  claim.

8       In Defendants' Film, pre-reanimation Zoe is an ambitious researcher like her
9  husband Frank, and post-animation is a possessed killer. In Plaintiff's Manuscript,
10  Ellion is described as a beautiful, resilient detective who is just as smart as she is
11  attractive.  Manuscript, p. 8.  The mere fact that two female characters are smart,
12  resilient, or attractive is not a basis for a copyright infringement claim.

13       Additionally, Plaintiff alleges that Zoe is similar to two minor characters in
14  Plaintiff's Manuscript because the two minor characters may have also been
15  reanimated. Even if they were reanimated, such characteristics of the minor characters
16  are not protectable expression. Many literary works in the past have depicted
17  characters who were reanimated or have otherwise risen from the dead. Plaintiff
18  asserts no protectable elements of the character Ellion, and therefore cannot satisfy the
19  substantial similarity analysis thereto.

20  **V.    CONCLUSION**

21       In light of the foregoing, the Court finds that Plaintiff has failed to demonstrate
22  that Plaintiff's Manuscript and Defendants' Film are substantially similar regarding
23  protectable elements.  Plaintiff is therefore unable to establish substantial similarity as
24  a matter of law.  Although only two of the named Defendants filed this motion,
25  Plaintiff asserts the very same copyright infringement claim against all Defendants, so
26  the above analysis governs the entire First Amended Complaint.  Furthermore,
27  Plaintiff cannot replead his claim to overcome his inability to prove that the works are
28  substantially similar.

**Exhibit 8**

Therefore, the Court **GRANTS** Defendants' Motion to Dismiss and hereby **DISMISSES WITH PREJUDICE** Plaintiff's entire First Amended Complaint.

**IT IS SO ORDERED.**

Dated: July 7, 2017

_____
HONORABLE ANDRÉ BIROTTE JR.
UNITED STATES DISTRICT COURT JUDGE

**Exhibit 8**