JS-6

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | EDCV 17-01153 JGB (KKx) | Date | January 18, 2018 |
|---|---|---|---|
| Title | *Tia Griffin v. Jordan Peele, et al.* | | |

Present: The Honorable   JESUS G. BERNAL, UNITED STATES DISTRICT JUDGE

| MAYNOR GALVEZ | Not Reported |
|---|---|
| Deputy Clerk | Court Reporter |

| Attorney(s) Present for Plaintiff(s): | Attorney(s) Present for Defendant(s): |
|---|---|
| None Present | None Present |

**Proceedings:**  **Order: (1) GRANTING Defendants' Motion to Dismiss (Dkt. No. 59); (2) DISMISSING Plaintiff's Second Amended Complaint; and (3) VACATING the January 22, 2018 Hearing (IN CHAMBERS)**

Before the Court is Defendants Jordan Peele, Blumhouse Productions, LLC, QC Entertainment, and NBC Universal Media, LLC's (collectively, "Defendants") motion to dismiss ("Motion," Dkt. No. 59) Plaintiff Tia Griffin's ("Plaintiff") second amended complaint ("SAC").  The Court finds this matter appropriate for resolution without a hearing.  See Fed. R. Civ. P. 78; L.R. 7-15.  After considering all papers timely filed in support of, and in opposition to, the Motion, the Court GRANTS Defendants' Motion, DISMISSES Plaintiff's SAC WITHOUT LEAVE TO AMEND, and VACATES the January 22, 2018 hearing.

### I.   BACKGROUND

On June 13, 2017, Plaintiff filed her complaint against Defendants.  (Dkt. No. 1.)  On July 12, 2017, Defendants filed a motion to dismiss.  (Dkt. No. 19.)  Plaintiff then filed a motion for leave to file a first amended complaint ("FAC").  (Dkt. No. 32.)  The Court granted Plaintiff's motion for leave to file a FAC and denied Defendants' motion to dismiss as moot.  (Dkt. No. 39.)  On September 12, 2017, Defendants filed another motion to dismiss.  (Dkt. No. 41.)  Plaintiff filed her FAC on September 13, 2017.  (Dkt. No. 42.)  On October 18, 2017, the Court granted Defendants' motion to dismiss the FAC with leave to amend.  ("October Order," Dkt. No. 51.)  Plaintiff filed her second amended complaint on November 8, 2017 alleging copyright infringement.  ("SAC," Dkt. No. 57.)  Defendants then filed this Motion on November 27, 2017.  They also filed a request for judicial notice.  ("RJN," Dkt. No. 60.)  Plaintiff filed an untimely

opposition on January 3, 2018.  ("Opposition," Dkt. No. 65.)[1]  Defendants filed a reply on January 8, 2018.  ("Reply," Dkt. No. 70.)

## II.     FACTUAL ALLEGATIONS

Plaintiff makes the following allegations in her SAC.  Plaintiff wrote and self-published a book titled "The Covering" ("Book"), which she registered with the U.S. Copyright Office.  (SAC at 2, 4.)  The Book was available on Amazon.com and Createspace.  (Id. at 17.)  The film "Get Out" ("Film") copies portions of the Book.  (Id. at 12-15.)  In particular, Plaintiff alleges Defendants copied the following from her Book: an interracial couple meeting the white partner's parents for the first time; a car accident, involving a deer, on the way to meet said parents; a dinner/special gathering; the characters and family dynamic; reference to a "sunken" or dark place; the sequential order of the story and events; "[t]he transitional behavior of the [C]aucasian partner in the relationship"; turmoil ensuing five months into the couple's relationship; "[t]he dehumanization factor"; and the "humanity" of the main character (Plaintiff) in the Book.  (Id.)  In the Court's October Order, it summarized Chapter Five of Plaintiff's Book as well as the Film.  (See October Order at 3.)  The Court finds it unnecessary to resummarize the plot lines here, but discusses them below.

Plaintiff alleges the Book was shopped to at least twenty publishing companies including Kensington Publishing.  (SAC at 17.)  Selena James of Dafina Books reviewed her manuscript.  (Id.)  James is an employee of Kensington Publishing, owned by the Zacharius family.  (Id.)  Adam Zacharius, who is in charge of Kensington's media division, has connections with Universal Pictures.  (Id.)  Also, James is friends with a writer and columnist with Huffington Post, Abiola Abrams.  Plaintiff "feel[s] that Selena [James] could have shared [Plaintiff's] story with Abrams.  Abrams then could have non-chalantly [sic] shared [Plaintiff's] story with . . . colleagues at the Huffington post casually.  One of those connections might have been Jonah Peretti who happens to be Jordan Peele's brother in law.  Thus, this portion of [Plaintiff's] story could have easily and casually got into the hands of Jordan Peele."  (Id. at 18.)

Further, James, Executive Editor of Dafina Books with Kensington Publishing, passed portions of Plaintiff's Book to her distribution business partners NBC Universal, which created the movie "Get Out."  (Id. at 7.)  Peretti, Peele's brother-in-law, had a business relationship with Steven Zacharius of Kensington Publishing.  Steven Zacharius wrote several blog posts for Huffington Post, which Peretti founded.  (Id.)  Adam, Steven, and Walter Zacharius produced the film "The Company We Keep," directed by Roy Campanella, Jr. who co-produced Defendant NBC Universal Media, LLC's sitcom "227" and an episode of NBC's "I'll Fly Away" in 1992.  (Id.)  Plaintiff claims these facts prove Kensington Publishing and their staff had

---

[1] The Court declines to consider the untimely Opposition.  See L.R. 7-12 ("The Court may decline to consider any memorandum or other document not filed within the deadline set by order or local rule.")  Plaintiff untimely filed her opposition to Defendants' last motion to dismiss, which the Court noted in its October Order.  The Court will not tolerate continued failure to follow the rules.

a relationship with NBC Universal.  (Id.)  An editor of the Film once worked for a subsidiary of a company acquired by Universal.  (Id. at 8.)  Further, Kensington Publishing has a distribution deal with Penguin Random House Publishing, which has a production agreement with Universal Pictures.  (Id.)

### III.     LEGAL STANDARD

Under Federal Rule of Civil Procedure 12(b)(6) ("Rule 12(b)(6)"), a party may bring a motion to dismiss for failure to state a claim upon which relief can be granted.  Rule 12(b)(6) must be read in conjunction with Federal Rule of Civil Procedure 8(a), which requires a "short and plain statement of the claim showing that a pleader is entitled to relief," in order to give the defendant "fair notice of what the claim is and the grounds upon which it rests."  Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007); see Horosny v. Burlington Coat Factory, Inc., No. 15-05005, 2015 WL 12532178, at *3 (C.D. Cal. Oct. 26, 2015).  When evaluating a Rule 12(b)(6) motion, a court must accept all material allegations in the complaint — as well as any reasonable inferences to be drawn from them — as true and construe them in the light most favorable to the non-moving party.  See Doe v. United States, 419 F.3d 1058, 1062 (9th Cir. 2005); ARC Ecology v. U.S. Dep't of Air Force, 411 F.3d 1092, 1096 (9th Cir. 2005); Moyo v. Gomez, 32 F.3d 1382, 1384 (9th Cir. 1994).

"While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."  Twombly, 550 U.S. at 555 (citations omitted).  Rather, the allegations in the complaint "must be enough to raise a right to relief above the speculative level."  Id.

To survive a motion to dismiss, a plaintiff must allege "enough facts to state a claim to relief that is plausible on its face."  Twombly, 550 U.S. at 570; Ashcroft v. Iqbal, 556 U.S. 662, 129 S. Ct. 1937, 1949 (2009).  "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully.  Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it stops short of the line between possibility and plausibility of 'entitlement to relief.'"  Iqbal, 556 U.S. at 678 (quoting Twombly, 550 U.S. at 556).  The Ninth Circuit has clarified that (1) a complaint must "contain sufficient allegations of underlying facts to give fair notice and to enable the opposing party to defend itself effectively," and (2) "the factual allegations that are taken as true must plausibly suggest an entitlement to relief, such that it is not unfair to require the opposing party to be subjected to the expense of discovery and continued litigation."  Starr v. Baca, 652 F.3d 1202, 1216 (9th Cir. 2011).

### IV.     DISCUSSION

**A. Judicial Notice**

Defendants request the Court take judicial notice of the following documents:

1. Plaintiff's full manuscript, "The Covering";
2. DVD containing a copy of the Film "Get Out";
3. Copy of the online docket in <u>Griffin v. Peele</u>, Riverside County Superior Court, RIC1703920;
4. Complaint filed by Plaintiff in <u>Griffin v. Peele, et al.</u>, Riverside County Superior Court, RIC1703920 ("State Court Action");
5. First Amended Complaint filed by Plaintiff in State Court Action;
6. Order dated June 7, 2017, sustaining Defendants' Demurrer in the State Court Action without leave to amend;
7. Order dated June 7, 2017, denying Defendants' Special Motion to Strike in the State Court Action;
8. Order granting Defendants' motion to dismiss in <u>Fillmore v. Blumhouse Productions, et al.</u>;
9. Deer Statistics by State 2016, State Farm; "Car and Deer Collisions Cause 200 Deaths Cost $4 Billion a Year," <u>Insurance Journal</u> (Oct. 24, 2012); "Oh Deer: States with the Most Collisions," ABC News (Oct. 8, 2010); "Investigations of Crashes with Animals," Federal Highway Administration; "River Road: A Novel," Simon & Schuster; "Seeing Deer," Orion Magazine; "Synopsis for Tammy," IMDB; "Synopsis for Cabin Fever," IMDB;
10. "Family Households, By Type, Age of Own Children, Age of Family Members, and Age of Householder: 2016," U.S. Census Bureau; "The American Family Today," Pew Research Center (Dec. 17, 2015); "The Nuclear Family is Still the Majority of the U.S. Households—Just Barely," Fast Company (Jul. 26, 2016);
11. "Pets by the Numbers," Humane Society; "New Survey Reveals Pet Ownership at All-Time High," American Pet Products Association (Feb. 21, 2013);
12. Excerpt of an online search for books on Amazon.com based on the phrase "interracial relationship"; "The Faces of Intermarriage, 50 Years after <u>Loving v. Virginia</u>," <u>The New York Times</u> (Jul. 6, 2017); "2010 Census Shows Interracial and Interethnic Married Couples Grew by 28 Percent over Decade," U.S. Census Bureau (Apr. 25, 2012); "Synopsis for Guess Who's Coming to Dinner," IMDB; "Guess Who," Roger Ebert (Mar. 24, 2005); "Synopsis for Loving," IMDB; "Synopsis for Jungle Fever," IMDB; "<u>Loving v. Virginia</u>: A documentary Novel of the Landmark Civil Rights Case," Publishers Weekly; "Book Review: 'The Girl Who Fell from the Sky' by Heidi W. Durrow," <u>The Washington Post</u> (Feb. 20, 2010); "'The Story of a Beautiful Girl': Love among the disturbed and forgotten," <u>The Washington Post</u> (Jun. 7, 2011); "'Wherever There is Light' review: A tale of lovers caught in history," <u>The Washington Post</u> (Nov. 24, 2015); "Synopsis for the Bodyguard," IMDB; "Synopsis for Lakeview Terrace," IMDB;
13. Excerpt of an online search on Google.com for the phrase "interracial relationship"; "The Other Woman," Publishers Weekly; "Meet the

    Parents," Roger Ebert (Oct. 6, 2000); "Synopsis for the Family Stone," IMDB; "Synopsis for the Proposal," IMDB; "Synopsis for Why Him?," IMDB; "Bringing My White Boyfriend Home to Mom," <u>The New York Times</u> (Oct. 8, 2012); "10 Hilariously Awkward Meet-the-Parents Stories," Glamour;

14. Bible, Genesis, Chapter 26, Verses 34-35; Bible, Luke, Chapter 12, Verses 52-53; "Synopsis for Meet the Fockers," IMB; "Synopsis for Shrek 2," IMDB; "Synopsis for the Great Outdoors," IMDB; "Synopsis for National Lampoon's Christmas Vacation," IMDB; "Film: Arkin and Falk In Comic 'In-Laws': Comedy of Insanity," <u>The New York Times</u> (Jun. 15, 1979); "Synopsis for My Big Fat Greek Wedding," IMDB; "Synopsis for Four Christmases," IMDB; "Love Story by Erich Segal—review," <u>The Guardian</u> (Nov. 25, 2011); "When did you get hooked?" London Review of Books (Apr. 11, 2013);

15. Complaint, dismissal, and docket from <u>Christian v. Kensington</u>, Case No. 14-cv-02301 (M.D. Tenn.);

16. First amended complaint, dismissal, and docket from <u>New York Periodical Distributors, Inc. v. Kensington Publishing</u>, Case No. 5:05-cv-66 (N.D.N.Y.); and

17. Complaint, dismissal, and docket from <u>Thompson v. Kensington Publishing</u>, Case No. 14-cv-02949-CM (S.D.N.Y.)

    Pursuant to Federal Rule of Evidence 201, "[a] court shall take judicial notice if requested by a party and supplied with the necessary information." Fed. R. Evid. 201(d). "A judicially noticed fact must be one not subject to reasonable dispute in that it is . . . capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b). Judicial notice is appropriate for "materials incorporated into the complaint or matters of public record." <u>Coto Settlement v. Eisenberg</u>, 593 F.3d 1031, 1038 (9th Cir. 2010).

    The Court takes judicial notice of Plaintiff's full manuscript "The Covering" and the DVD of the Film "Get Out." See <u>Campbell v. Walt Disney Co.</u>, 718 F. Supp. 2d 1108, 1111 n.3 (N.D. Cal. 2010) (taking judicial notice of a motion picture and screen play). As the Court recognized in its October Order, other courts in this circuit have found it appropriate to take judicial notice of the works at issue in a copyright infringement action. <u>See, e.g.</u>, <u>Newt v. Twentieth Century Fox Film Corp.</u>, No. 15-02778, 2016 WL 4059691, at *2-3 (C.D. Cal. July 27, 2016), <u>appeal dismissed</u>, 2017 WL 3923362 (9th Cir. Jan. 3, 2017); <u>Braddock v. Jolie</u>, No. 12-05583, 2013 WL 12125754, at *1 n.2 (C.D. Cal. Mar. 29, 2013), <u>aff'd</u>, 691 Fed. Appx. 318 (9th Cir. 2017).

    The Court also takes judicial notice of the order in <u>Fillmore v. Blumhouse Productions, et al.</u>, but not for the truth of the facts asserted therein. See <u>Reyn's Pasta Bella, LLC</u>, 442 F.3d at 746 n.6. The Court, however, need not take judicial notice of Defendants' case law, as the Court

can consider this opinion without taking judicial notice of it.  See Rios v. CWGS Enterprises, LLC, No. CV1703614RSWLAFMX, 2017 WL 3449052, at *2 (C.D. Cal. Aug. 11, 2017).

The Court declines to take judicial notice of the remaining documents, as it does not rely on these materials in reaching its decision.  Thus, the Court GRANTS IN PART and DENIES IN PART the RJN.

**B. Copyright Claim**

As the Court explained in its October Order, to state a claim for copyright infringement, the plaintiff must show "(1) ownership of the allegedly infringed work and (2) copying of the protected elements of the work by the defendant." Unicolors Inc. v. Urban Outiffters Inc., 853 F.3d 980, 984 (9th Cir. 2017) (citing Pasillas v. McDonald's Corp., 927 F.2d 440, 442 (9th Cir. 1991)).

To prove the second element, "copying," a plaintiff must either show direct evidence of copying or demonstrate this "element through circumstantial evidence that (1) the defendant had access to the copyrighted work prior to the creation of defendant's work and (2) there is a substantial similarity of the general ideas and expression between the copyrighted work and the defendant's work."  Id. at 984-85. (citing Sid & Marty Krofft Television Prods., Inc. v. McDonald's Corp., 562 F.3d 1157, 1162 (9th Cir. 1977), superseded on other grounds by 17 U.S.C. § 504(b)).   A plaintiff usually presents circumstantial evidence of access through evidence of a "'chain of events . . . between the plaintiff's work and defendants' access to that work' or evidence that 'the plaintiff's work has been widely disseminated.'"  Id. at 985 (citing Three Boys Music Corp. v. Bolton, 212 F.3d 477, 482 (9th Cir. 2000)).  According to the "inverse ratio rule," when a plaintiff demonstrates a high degree of access, a lower standard of proof of similarity is required.  Three Boys Music Corp., 212 F.3d at 485 (citing Smith v. Jackson, 84 F.3d 1213, 1218 (9th Cir. 1996), superseded by statute, Anticounterfeiting Consumer Protection Act of 1996, Pub. L. No. 104-153, § 3, 110 Stat. 1386)).  A plaintiff can show a "striking similarity" between the works, if no evidence of access exists, to raise an inference of copying.  Unicolors, 853 F.3d at 985 (citing Baxter v. MCA, Inc., 812 F.2d 421, 423 (9th Cir. 1987)).

   1. **Access**

To prove access, a plaintiff must show "'an opportunity to view or to copy plaintiff's work.'"  Three Boys Music Corp, 212 F.3d at 482 (quoting Sid and Marty Krofft Television Productions, Inc. v. McDonald's Corp., 562 F.2d 1157, 1172 (9th Cir. 1977)).  In essence, a plaintiff must demonstrate a "'reasonable opportunity' or 'reasonable possibility' of viewing the plaintiff's work."  Id. (citing 4 Melville B. Nimmer & David Nimmer, *Nimmer on Copyright*, § 13.02[A], at 13-19 (1999); Jason v. Fonda, 526 F. Supp. 774, 775 (C.D. Cal. 1981), aff'd, 698 F.2d 966 (9th Cir. 1982)).  Reasonable access means "more than a 'bare possibility.'"  Id. (quoting Jason, 698 F.2d at 967) (internal quotation marks omitted)).  A plaintiff may present circumstantial evidence of reasonable access by either (1) a chain of events between plaintiff's

work and the defendant's access to such, or (2) wide dissemination of plaintiff's work. Id. (citation omitted).

The Court determines that Plaintiff's SAC does not fill in the missing links associated with her FAC. To be sure, Plaintiff provides additional information in her SAC, but the information simply lengthens the already too attenuated chain of events. Defendants cite to several cases which are instructive, although they involve motions for summary judgment. In Loomis v. Cornish, 836 F.3d 991, 996 (9th Cir. 2016), the Ninth Circuit held "bare corporate receipt" of plaintiff's work by an individual who shares a common employer as the copier does not suffice to show access. Similarly in Meta-Film Associates, Inc. v. MCA, Inc., 586 F. Supp. 1346, 1355 (C.D. Cal. 1984), the district court could not find access based on a "chain of hypothetical transmittals." There, the court wrote: "it is clearly unreasonable to attribute the knowledge of any one individual—especially a non-employee—to every other individual just because they occupy offices on the same studio lot." Id. at 1357-58.

In Fillmore, the court, in considering a motion to dismiss, explained:

> The Ninth Circuit has often determined "opportunity to view" in light of a defendant's reasonable potential to view a plaintiff's work. Three Boys, 212 F.3d at 482 (quoting Jason v. Fonda, 526 F. Supp. 744 (C.D. Cal. 1981), aff'd, 698 F.2d 966 (9th Cir. 1983)). Access cannot be inferred from Plaintiff's "mere speculation or conjecture." Three Boys, 212 F.3d at 482 (quoting 4 Nimmer, *Nimmer on Copyright* § 13.02[A[, at 13-19 (2003)). Instead, Plaintiff must show a "reasonable possibility of viewing [his] work—not a bare possibility."

Fillmore v. Blumhouse Prods., LLC, No. 2:16-cv-04348-AB-SS, 2017 WL 4708018, at *4 (C.D. Cal. Jul. 7, 2017). Plaintiff's allegations that James gave the manuscript to Abrams who "could have shared" it with Peretti, who is Peele's brother-in-law does not allege that Abrams actually gave it to Peretti. (SAC at 18.) Even if she did, the allegations would establish nothing more than a "bare possibility" of access. Alternatively, the owner of Kensington, where James works, has written for Huffington Post. (Id. at 17.) Even more attenuated is the alleged connection between James and NBC Universal. The owners of Kensington allegedly once produced a film directed by an individual who has also worked on two unrelated productions by a company affiliated with Defendant NBC Universal. (Id. at 7.) These chain of events are too speculative and support nothing more than a bare possibility of access.

As before, Plaintiff does not sufficiently allege the Book was disseminated widely enough to demonstrate "access." The Ninth Circuit has said, "although [they] recognize the power of the internet to reach a wide and diverse audience, [internet presence is not necessarily] sufficient to demonstrate with dissemination." Art Attacks Ink, LLC v. MGA Enter. Inc., 581 F.3d 1138, 1145 (9th Cir. 2009). "In most cases, the evidence of widespread dissemination centers on the degree of a work's commercial success and on its distribution through radio, television, and other relevant mediums." Loomis v. Cornish, 836 F.3d 991, 997 (9th Cir. 2016) (citations omitted). As stated in the October Order, Plaintiff does not allege the level of dissemination beyond the

assertion that the Book was available on Amazon.com and Createspace.  (See SAC at 17.)  The Ninth Circuit found a video that sold 17,000 copies and a book that sold between 200 and 700 copies were not widely disseminated.  See Rice v. Fox Broad Co., 330 F.3d 1170, 1178 (9th Cir. 2003) ("*The Mystery Magician* only sold approximately 17,000 copies between 1986 and 1999; therefore, the video cannot be considered widely disseminated."); Jason v. Fonda, 526 F. Supp. 774, 776 (C.D. Cal. 1981), aff'd, 698 F.2d 966 (between 200 and 700 copies in sales creates no more than a "bare possibility" that defendants had access to the book).

In Fillmore, the plaintiff alleged numerous similarities between his manuscript and the defendants' film.  2017 WL 4708018, at *1.  The plaintiff alleged that he submitted the manuscript, either excerpts or in its entirety, "to various talent agents, literary agents, management companies and publishers throughout the United States, and made it commercially available through the 'print on demand' publisher 'lulu.com.' [citation omitted.] Plaintiff also contends that he distributed either electronic or hard copies of his manuscript to pay-for-critique services, family, friends, associates, and one editor for hire. [citation omitted.]" Id.  The court found the allegations insufficient to allege access at the motion to dismiss stage; the allegations created "no more than a bare possibility that [the d]efendants had access to the [m]anuscript." Id. at *5.  Further, the court wrote: The plaintiff's "allegations that he sent copies to agents, friends, and family cannot plausibly establish that the Manuscript was disseminated widely." Id.  The plaintiff did not allege any sales, but simply that he sent the manuscript to talent agents, literary agents, and the like.  Id.

Here too.  Plaintiff's SAC presents no factual allegations that the Book was distributed or sold in a volume exceeding that in Rice or Jason.  In fact, Plaintiff does not allege any sales.  She merely alleges that she sent the manuscript to at least twenty publishing houses and it was available on Amazon.com and Createspace.  (SAC at 17-18.)  Accordingly, the Court finds Plaintiff has not pled facts sufficient to demonstrate access.

   2. **Striking Similarity**

Because the Court finds Plaintiff cannot establish a high probability of access, Plaintiff must allege facts sufficient to show the works were strikingly similar.  Even if Plaintiff were able to show access and the less demanding substantially similar standard applies, Plaintiff cannot meet it.

The substantial similarity test includes two components: an intrinsic component and an extrinsic component.  Funky Films, Inc. v. Time Warner Entm't Co., 462 F.3d 1072, 1077 (9th Cir. 2006).  While the intrinsic component evaluates "an ordinary person's subjective impressions of similarities between the two works," the extrinsic component determines whether substantial similarity between the works exists as a matter of law.  Id.  The intrinsic component is a question of fact for the jury; the extrinsic component is a question for the court.  Id.  To establish substantial similarity, both components must be present.  See Kouf v. Walt Disney Pictures & TV, 16 F.3d 1042, 1045 (9th Cir. 1994).

>The extrinsic test focuses on "articulable similarities between the plot, themes, dialogue, mood, setting, pace, characters, and sequence of events" in the two works. Kouf, 16 F.3d at 1045 (citations omitted). In applying the extrinsic test, this court "compares, not the basic plot ideas for stories, but the actual concrete elements that make up the total sequence of events and the relationships between the major characters." Berkic [v. Crichton], 761 F.2d [1289,] 1293 [(9th Cir. 1985)].

Funky Films, Inc., 462 F.3d at 1077. Courts only consider whether "'the *protectible elements, standing alone,* are substantially similar.'" Cavalier v. Random House, 297 F.3d 815, 822 (9th Cir. 2002) (emphasis in original) (citation omitted). Copyright law does not protect general plot ideas. Id. at 823. Further, "situations and incidents that flow necessarily or naturally from a basic plot premise cannot sustain a finding of infringement." Id. (citation omitted). "The Ninth Circuit is 'particularly cautious [in finding substantial similarity] where[ a] list [of perceived similarities] emphasizes random similarities scattered throughout the works.'" Shame on You Prods., Inc. v. Elizabeth Banks, 120 F. Supp. 3d 1123, 1151 (C.D. Cal. 2015), aff'd sub nom. Shame on You Prods., Inc. v. Banks, 690 F. App'x 519 (9th Cir. 2017) (quoting Litchfield v. Spielberg, 736 F.2d 1352, 1356 (9th Cir.1984)).

  a. **Setting, Plot and Sequence of Events**

"[P]lot is defined as the 'sequence of events by which the author expresses his theme or idea' that is sufficiently concrete to warrant a finding of substantial similarity if it is common in both works." Zella v. E.W. Scripps Co., 529 F. Supp. 2d 1124, 1135 (C.D. Cal. 2007) (quoting 4 Nimmer, *Nimmer on Copyright* § 13.03[A][1][b]. at 13-42 )2003)). "[G]eneral plot ideas are not protected by copyright law." Berkic, 761 F.2d at 1293.

Plaintiff's Book, a non-fiction, self-help work, depicts Plaintiff's dating history and relationships and provides advice about adhering to your religious beliefs. (RJN, Ex. 1.) Chapter Five discusses Plaintiff's relationship with high school teacher Darron. (Id., Chp. 5.) Plaintiff appears to be suspicious of Darron's close relationship with his high school students. (Id. at 85-87, 94-102.) Plaintiff expresses her concerns to Darron's employer, after which their relationship ends, save a brief period following their breakup. (Id.)

Defendants' Film, a feature-length horror movie, depicts a young African-American photographer (Chris) who meets his white girlfriend's family during a weekend trip to their country estate. Chris confronts racial tensions at the family gathering. Prior to leaving the estate, the family, including his girlfriend, tie Chris to a chair in the cellar. He discovers that the family has been partaking in experimental medical procedures and intend to victimize him as well. He ultimately escapes.

Despite the seemingly obvious differences, Plaintiff argues that both the Film and the Book depict accidents involving a deer. In the Book, Plaintiff describes how, when she and Darron are driving to his family's house for Thanksgiving, they hit a deer and the car spins 360

degrees. (RJN, Ex. 1 at 74.) In the Film, the deer accident resulted in a run-in with the police. The Film references deer more than once following the incident, whereas the Book does not.

Plaintiff also alleges that the family units are similar: both plots involve two parents, a sibling, and a dog. Further, she alleges, there are interracial couples and family tensions. However, as the Ninth Circuit recognized in Berkic, "[g]eneral plot ideas are not protected by copyright law; they remain forever the common property of artistic mankind." 761 F.2d at 1293.

Regarding the sequence of events, Plaintiff contends Defendants copied the sequential order of her Book: beginning a romantic relationship, meeting the family, and facing turmoil five months into the relationship. (SAC at 14.) However, "situations and incidents that flow necessarily or naturally from a basic plot premise, cannot sustain a finding of infringement." Cavalier, 297 F.3d at 823. These alleged similarities flow naturally from plots involving relationships and intimacy. Thus, such similarities are unprotected. Further, as Defendants point out, the similarities are a matter of fiction. The meeting of the family occurs at different family gatherings/functions and at different points in the relationship, and the turmoil results from different events and concerns.

Turning to the setting, Plaintiff's Book takes place in Washington State, particularly at Darron's high school, his family's home, restaurants and bars, Plaintiff's work, and her church. (RJN, Ex. 1 at 76.) The Film, by contrast, occurs primarily in upstate New York at a country estate. Plaintiff also alleges infringement with regard to the Book's "dark place" and the Film's "sunken place." In the Book, Plaintiff writes: "When two people truly love each other, they don't want the other person to be shoved into a dark place. They want them to be safe, away from the rocks, out of the darkness, and protected." (Id. at 115.) Assuming, without deciding, reference to a "dark place" is protectable, it is distinct from the Film's "sunken place." The "sunken place" refers to a form of "limited consciousness" that Chris falls into whenever he hears the sounds of Rose's mother striking a spoon on her teacup. (RJN, Ex. 2, 35:18, 1:09:38, 1:15:25.)

    b.  Theme

Although themes may be similar, works can explore them in different ways such that they are not substantially similar. Funky Films, Inc., 462 F.3d at 1077. Both works explore themes of relationships and race, but do so in distinct ways. The Book is a first-person account of an interracial relationship and focuses on both dating and staying true to one's religious beliefs. By contrast, the primary theme of the movie, racism, is explored through the lens of a horror movie. As the district court in Fillmore eloquently said, "Because said themes in Plaintiff's Manuscript and Defendants' Film had different substance, motivation, and literary purpose, these common themes cannot establish extrinsic similarity in this instance." 2017 WL 4708018, at *8.

### c. Mood

As stated, Plaintiff's Book is a non-fiction, self-help book. Defendants' Film is of the horror and suspense genre, and the mood reflects such. Thus, the moods are drastically different.

### d. Dialogue

Neither Plaintiff nor Defendants cite similar dialogue found in the Book and the Film.

### e. Pace

The pace is different in the Book and the Film. The Book details events that occurred over at least thirteen months. (RJN, Ex. 1 at 131.) The Film centers on a single weekend. The Court, thus, finds the pace of the two works dissimilar.

### f. Characters

"[A] character may be protectable if it has distinctive character traits and attributes, even if the character does not maintain the same physical appearance in every context." DC Comics v. Towle, 802 F.3d 1012, 1020 (9th Cir. 2015). "[C]ourts require a very high degree of similarity between the characters." Silas v. Home Box Office, Inc., 201 F. Supp. 3d 1158, 1177 (C.D. Cal. 2016), appeal docketed, 16-56215 (9th Cir. Aug. 25, 2016).

The Court finds there is not a high degree of similarity between the characters in the two works. The Book mainly concerns the Plaintiff, a single mother of four teenagers, who was "going to college full time" and "working a night shift." (RJN, Ex. 1 at 70.) Chapter Five also features Darron, Plaintiff's ex-fiancé. (Id. at 70-73.) He is a high-school teacher who lives hours away from Plaintiff. (Id.) Darron is Caucasian; Plaintiff is black. (SAC at 13.)

In the Film, the main couple is also in an interracial relationship. Chris is black; Rose is Caucasian. Chris is a photographer. Rose has no children. They are not engaged. The Film also features several other characters, including Chris's friend, Rose's mother and father, Rose's brother, and a housekeeper and groundskeeper. Accordingly, the Court finds Plaintiff has failed to allege facts that would show a high degree of similarity between the characters.

## C. Violations of the Lanham Act

In her FAC, Plaintiff alleged two additional causes of action under the Lanham Act: (1) "false or misleading statements made in commerce," and (2) "misattribution." (FAC at 2, 22.) While Plaintiff seems to have abandoned the Lanham Act causes of action, her SAC includes allegations that the Film failed to credit her and her Book. To the extent, Plaintiff attempts to allege a Lanham Act claim, she cannot maintain such a claim under Dastar Corp. v. 20th Century Fox Film Corp., 539 U.S. 23 (2003).

In its October Order, the Court dismissed Plaintiff's Lanham Act claims pursuant to the Supreme Court's holding in Dastar. (See October Order at 9-10.) The same reasoning holds true with regard to Plaintiff's SAC. Accordingly, the Court dismisses Plaintiff's claims, if any, brought under the Lanham Act.

### D. Leave to Amend

Generally, a "district court should grant leave to amend even if no request to amend the pleading was made, unless it determines that the pleading could not possibly be cured by the allegation of other facts." Lopez v. Smith, 203 F.3d 1122, 1127 (9th Cir. 2000) (en banc) (internal quotation marks and citations omitted).

In its October Order, the Court identified several deficiencies with Plaintiff's FAC and granted Plaintiff leave to amend. Plaintiff's SAC does not fare any better and suffers from the same shortcomings, thus demonstrating that any further leave to amend would be futile.

### g. CONCLUSION

For the foregoing reasons, the Court GRANTS Defendants' Motion and DISMISSES Plaintiff's SAC WITHOUT LEAVE TO AMEND. The January 22, 2018 hearing is hereby VACATED.

**IT IS SO ORDERED.**